Glenn Emile SEUREAU and Glenn
Edouard Seureau, Appellants

v.

EXXONMOBIL CORPORATION and
Port of Houston Authority,
Appellees.

No. 14–07–00176–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 16, 2008.

Tom F. Coleman, Houston, TX, for appellants.

Alice A. Brown, W. Allyn Hoaglund, Alexander Christos Papandreou, Glenn R. Legge and Alan Brandt Daughtry, Houston, TX, for appellees.

Panel consists of Justices YATES, BROWN, and BOYCE.

## OPINION

JEFF BROWN, Justice.

This appeal arises from the unrealized real-estate development plans of appellants Glenn Emile Seureau and Glenn Edouard Seureau. Their land abutted property that was to be developed by the Port of Houston Authority. In hopes of prospering from the neighboring development, the Seureaus contracted with Humble Oil & Refining Company, now ExxonMobil, to be included in the project. Several years later, however, ExxonMobil withdrew from the project, and the Port exercised its eminent-domain powers against appellants' land. The Seureaus responded by suing the Port and ExxonMobil for breach of contract and fraudulent inducement. The trial court dismissed their claims against the Port because of governmental immunity, and granted ExxonMobil's motion for summary judgment on several grounds, including limitations. The Seureaus have appealed both rulings. We will affirm.

## BACKGROUND

Appellants are Glenn Edouard Seureau ("Father") and Glenn Emile Seureau, Jr. ("Son"), who owned land in the Galveston Bay area. In 1960, Glenn Emile Seureau, Sr. ("Grandfather") deeded some of the Seureaus' land to Humble Oil & Refining Company, now ExxonMobil.[1] ExxonMobil then transferred that land to the Port of Houston Authority ("the Port"), which was to use the land to build and operate a port facility to be known as Bayport. To finance the Bayport project, the Port would issue revenue bonds that were to be purchased by ExxonMobil.

Grandfather and Father continued to own land adjoining the Bayport project. It was their desire to participate in the commercial development of the Bayport area and, as such, in 1966 they approached ExxonMobil with a written proposal (the "Letter Agreement") which Grandfather had authored. Therein the Seureaus offered to sell additional land to ExxonMobil under the following conditions. First, to the extent of ExxonMobil's interest in the Bayport project, ExxonMobil would assist the Seureaus in developing their remaining land, consisting of 175 acres, so as to profit from the burgeoning Bayport project. Second, should ExxonMobil deem any of the land acquired from the Seureaus as "surplus" to its needs, it was to offer that surplus land to the Seureaus for repurchase. Third, in the event that ExxonMobil should acquire a specific piece of neighboring property (the "Hollier tract"), the parties might swap a thirteen-acre parcel of the Seureaus' remaining land (the "Triangular tract") for thirteen acres of the Hollier tract.

ExxonMobil agreed to these conditions and executed the Letter Agreement. It acquired the lands offered by the Seureaus, including the entirety of Father's land. Grandfather continued to retain 175 acres of remaining land and, upon his death, that land passed to Son. During the next few decades, the Port continued to develop the Bayport project, and ExxonMobil sold chunks of its neighboring land;

---

1. For the sake of clarity, ExxonMobil's predecessor entities, including Humble Oil & Refining Company and Friendswood Development Company, will be identified throughout this opinion as "ExxonMobil."

however, the portion of its land that abutted the Seureaus' property remained largely undeveloped, and the Seureaus made no inquiry into the status of the Bayport project or the further development plans.

In October 1997, ExxonMobil withdrew from the Bayport project and entered into a compromise settlement agreement with the Port. Through that agreement, Exxon-Mobil transferred all of its remaining interest in Bayport, including land previously acquired from the Seureaus, to the Port. Appellants have contended that, in doing so, ExxonMobil breached its contractual promise to first offer such surplus land to the Seureaus. Moreover, at the time that it exited the Bayport project, ExxonMobil had not accomplished its promises to assist in the development of the Seureaus' remaining 175 acres.

In June 1998, Father and Son met with the Port's real-estate manager and learned that the Port had acceded to all of Exxon-Mobil's interest in the Bayport area, including the 1966 land acquired from the Seureaus. Upon learning that ExxonMobil had ceased its involvement in the Bayport project, the Seureaus met with the Port's chairman in July 1998 and insisted that the Port was bound to honor Exxon-Mobil's contractual promises under the Letter Agreement. While not committing itself to the Letter Agreement's obligations, the Port was intrigued by the land swap (*i.e.*, Hollier tract for Triangular tract) proposed therein.

However, wary of the Port's motives, Son refused to go forward with the trade unless the Port would agree to waive its eminent-domain powers. The Port refused to do so and, in May 2002, instituted proceedings to condemn appellants' property. The Seureaus responded by bringing a lawsuit against the Port and Exxon-Mobil. They alleged that the Port and ExxonMobil acted in a joint enterprise to breach the terms of the Letter Agreement. During discovery, the Seureaus were provided with a copy of the 1964 written agreements between the Port and Exxon-Mobil and discovered that those agreements afforded ExxonMobil no control whatsoever over the development of the Bayport project. The Seureaus then amended their suit to claim that ExxonMobil fraudulently induced them into selling their land under the 1966 Letter Agreement by overstating its degree of control over the Bayport development.

ExxonMobil moved for summary judgment in which it argued, *inter alia*, that appellants' claims are time-barred by the statute of limitations. The Port also asserted a plea to the jurisdiction on the basis of governmental immunity. The trial court granted both motions, thereby ending the litigation. Father and Son have appealed both rulings. During the pendency of this appeal, Son settled his claims against the Port, and we dismissed the portion of his appeal that relates to the Port. This prompted the Port to contend that, as to it, the appeal has become moot because Father lacks legal standing.

## STANDING

Because standing is a threshold issue that is implicit in the concept of subject-matter jurisdiction, we first address Father's standing. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex.1993). In addressing standing, we review the plaintiff's pleadings to determine whether the petition alleges facts that affirmatively demonstrate our jurisdiction to hear the case. *See id.* at 446. We must construe the petition in the plaintiff's favor and, if necessary, we will review the entire record to determine if any evidence supports standing. *See id.*

Much of the underlying lawsuit relates to the 175 acres of land which belong exclusively to Son, and in which Father retains no ownership interest. However, Father owned some of the land that was sold to ExxonMobil in 1966 and, in the underlying lawsuit, he seeks rescission of that earlier conveyance. Appellants have alleged that the Port now owns some of the land that Father seeks to re-acquire, and have further contended that the Port, as a participant in a joint enterprise, is legally responsible for ExxonMobil's alleged misdeeds. Because we construe appellants' petition in their favor, we do not pass on the merits of their joint-enterprise allegations in this standing discussion. *See id.; see also Doncer v. Dickerson,* 81 S.W.3d 349, 356 (Tex.App.-El Paso 2002, no pet.) ("It should always be borne in mind that standing to sue does not mean a right to win, but merely a right to be heard in court."); *In re Smith,* 260 S.W.3d 568, 573 (Tex.App.-Houston [14th Dist.] 2008, orig. proceeding).

We conclude that Father has a justiciable interest in the appeal of the trial court's order granting the Port's plea to the jurisdiction. *See Austin Nursing Ctr., Inc. v. Lovato,* 171 S.W.3d 845, 848 (Tex. 2005). Therefore, we hold that Father has standing and that we have subject-matter jurisdiction to consider his challenge to the Port's assertion of governmental immunity.

## GOVERNMENTAL IMMUNITY

Father contends that the trial court erred in granting the Port's plea to the jurisdiction and dismissing the Seureaus'

claims, because appellants had established the Legislature's consent to their lawsuit. First, he argues that notwithstanding the contrary conclusion reached by the Texas Supreme Court in *Tooke v. City of Mexia,*[2] the Legislature clearly and unambiguously consented to this suit by employing "sue and be sued" language in the statute governing navigation districts. Second, he urges us to extend the holding in *Texas Department of Transportation v. Able*[3] to recognize joint venture as a separate ground for finding waiver of governmental immunity in contract actions. Third, Father argues that the Port's conduct is so egregious as to fit the rather limited "waiver by conduct" possibility the Texas Supreme Court theorized in a footnote to *Federal Sign v. Texas Southern University.*[4] We will address each of these contentions in turn, following a discussion of basic governmental-immunity principles.

### A. Immunity, Generally

▇▇▇ A trial court must have subject-matter jurisdiction before it may hear a case. *See Tex. Ass'n of Bus.,* 852 S.W.2d at 443. A plaintiff bears the initial burden of alleging facts that affirmatively demonstrate the trial court's subject-matter jurisdiction over the suit. *Id.* at 446. A defendant may challenge the court's subject-matter jurisdiction through a plea to the jurisdiction. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). Where, as here, the defendant is a governmental entity, it may file a plea to the jurisdiction asserting governmental immunity.[5] *See Tex. Natural Res. Conservation*

---

2. 197 S.W.3d 325 (Tex.2006).

3. 35 S.W.3d 608 (Tex.2000).

4. 951 S.W.2d 401, 408 n. 1 (Tex.1997).

5. Courts occasionally use the terms "sovereign immunity" and "governmental immuni-

ty" interchangeably, although they are two distinct concepts. *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3 (Tex. 2003). "Sovereign immunity" refers to the State's immunity from suit and liability, and its protection extends to the State and its various divisions of state government. *Id.*

*Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex.2002). Under the doctrine of governmental immunity, such a political subdivision of the State may be immune from suit. *See Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex.1999). Governmental immunity consists of two components, immunity from liability and immunity from suit. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex.2006). A governmental entity that enters into a contract may waive immunity from liability and voluntarily bind itself to the contractual terms, but the entity does not thereby waive immunity from suit. *Id.* Immunity from suit, by contrast, bars a suit against the governmental entity unless the Legislature expressly consents to the suit by resolution or by clear and unambiguous statutory language. *See id.* at 332–33; *IT–Davy*, 74 S.W.3d at 853–54. Thus, a plaintiff who sues a governmental entity must establish the State's consent to suit. *See IT–Davy*, 74 S.W.3d at 855. Absent such express consent, the governmental entity retains immunity even if its liability is undisputed. *Id.* at 853.

### B. Standard of Review

■ When a plea to the jurisdiction challenges the pleadings, the trial court considers the allegations in the plaintiff's petition, which is to be construed in favor of the plaintiff, to determine if the plaintiff alleged facts affirmatively demonstrating the court's jurisdiction to hear the case. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004). To the extent relevant to the jurisdiction issue, the trial court may also consider evidence submitted by the parties. *Bland Indep. Sch. Dist.*, 34 S.W.3d at 555. If the trial court concludes that a fact issue exists, the plea may not be granted. *Miranda*, 133 S.W.3d at 227–28. If the relevant evidence is undisputed or fails to raise a fact issue as to jurisdiction, the trial court may rule on the plea as a matter of law. *Id.* at 228. On appeal, because subject-matter jurisdiction is a question of law, we review the trial court's ruling on a plea to the jurisdiction de novo. *Houston Mun. Employees Pension Sys. v. Ferrell*, 248 S.W.3d 151, 156 (Tex.2007).

### C. "Sue and Be Sued"

■ The Port is a navigation district and political subdivision of the State. *City of Seabrook*, 199 S.W.3d at 404. The Legislature created the Port in 1927 pursuant to article III, section 52, of the Texas Constitution.[6] In 1957, the Legislature converted the Port into an article XVI, section 59 district.[7] While the converted district was to operate under article XVI, section 59, it retained all powers conferred upon it through article III, section 52. *See* Tex. Water Code Ann. § 60.246 (Vernon 2004); Act of Apr. 11, 1957, 55th Leg.,

"Governmental immunity," by contrast, protects political subdivisions of the State, including counties, cities, and school districts. *Id.* The Port is a navigation district and a political subdivision of the State. *Guillory v. Port of Houston Auth.*, 845 S.W.2d 812, 812–13 (Tex.1993); *City of Seabrook v. Port of Houston Auth.*, 199 S.W.3d 403, 404 (Tex. App.-Houston [1st Dist.] 2006, pet. dism'd). Therefore, we will use the term "governmental immunity" in this opinion.

6. *See* Tex. Const. art. III, § 52; Act of 1927, 40th Leg., R.S., ch. 97, § 1, 1927 Tex. Gen. Laws 256, 256–57, *amended by* Act of Apr. 11, 1957, 55th Leg., R.S., ch. 117, § 2, 1957 Tex. Gen. Laws 241, 247.

7. *See* Tex. Const. art. XVI, § 59; Act of Apr. 11, 1957, 55th Leg., R.S., ch. 117, § 2, 1957 Tex. Gen. Laws 241, 247, *amended by* Act of May 25, 1987, 70th Leg., R.S., ch. 1042, § 1, 1987 Tex. Gen. Laws 3506, 3506–07; *see also* Tex. Water Code Ann. § 60.241, *et seq.* (Vernon 2004) (authorizing conversion of a district created under article III, section 152, into an article XVI–section–59 district).

R.S., ch. 117, § 2, 1957 Tex. Gen. Laws 241, 247.

An article–III–section–52 navigation district is governed by chapter 61 of the Texas Water Code. *See* Tex. Water Code Ann. § 61.021 (Vernon 2004). Chapter 61 provides that such a navigation district "may sue and be sued in any court in this state in the name of the district." *See id.* § 61.082(a). Chapter 62, which applies to article–XVI–section–59 navigation districts, contains a similar provision stating that a navigation district may "sue and be sued" in the name of the district. *See id.* §§ 62.021, 62.078(a). Father argues that these statutes clearly and unambiguously signal a legislative intent to waive a navigation district's governmental immunity from suit. We disagree.

In 1970, the Texas Supreme Court held that such "sue and be sued" language granted legislative consent for lawsuits against navigation districts. *See Mo. Pac. R.R. Co. v. Brownsville Navigation Dist.,* 453 S.W.2d 812, 813 (Tex.1970). The majority of appellate courts, including this Court, relied on *Missouri Pacific* to conclude that "sue and be sued" language indicated a "sufficient pronouncement of legislative intent to waive immunity from suit." *See, e.g., Tomball Hosp. Auth. v. Harris County Hosp. Dist.,* 178 S.W.3d 244, 251–53 (Tex.App.-Houston [14th Dist.] 2005, pet. granted). That reliance proved misplaced in 2006, when the Texas Supreme Court overruled *Missouri Pacific:*

> Accordingly, we conclude that *Missouri Pacific* must be, and now is, overruled.... [T]he holding of *Missouri Pacific* that "sue and be sued," by itself, in an organic statute always waives immunity from suit *is simply incorrect.* The phrase is often used to mean only that an entity has the capacity to sue and be sued in its own name. Because the phrase means different things in differ-

ent statutes, it cannot be said to be clear and unambiguous. As we have seen, the words "sue and be sued," standing alone, are if anything, unclear and ambiguous. The effect of similar clauses, like "plead and be impleaded," is indistinguishable, and therefore those clauses do not, by themselves, waive immunity.

*Tooke,* 197 S.W.3d at 342 (emphasis added).

Although *Tooke* rung the death knell for *Missouri Pacific,* Father nonetheless urges us to resuscitate it and conclude that the Legislature consented to the suit. When this lawsuit was filed in 2002, he argues, "there was no doubt that" the Port's immunity had been waived under the rationale of *Missouri Pacific.* Then, in 2005, the Legislature enacted a statute providing for a limited waiver of a governmental entity's immunity for entering into certain types of contracts. *See* Tex. Loc. Gov't Code Ann. § 271.152 (Vernon 2005). The enacting legislation provided that "[a] claim that arises under a contract executed before the effective date of this Act *and with respect to which sovereign immunity has been waived* is governed by the law in effect on the date the contract was executed, and the former law is continued in effect for that purpose." Act of May 23, 2005, 79th Leg., R.S., ch. 604, § 2, 2005 Tex. Gen. Laws 1548, 1549 (emphasis added). The effect of this 2005 legislation, Father argues, was to preserve the *Missouri Pacific* waiver of the Port's immunity notwithstanding the Texas Supreme Court's subsequent pronouncement in *Tooke.* We must reject this argument for at least three reasons.

First, it is debatable whether the 2005 legislation even applies to Father's claims against the Port. The legislation's limited waiver of immunity provides:

> A local governmental entity that is authorized by statute or the constitution to

enter into a contract *and that enters into a contract subject to this subchapter* waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter. Tex. Loc. Gov't Code Ann. § 271.152 (emphasis added). A "contract subject to this subchapter" is defined as "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." *See id.* § 271.151(2). However, the Port did not enter into a "contract subject to this subchapter." It is uncontroverted that the Port was not a nominal party to the Seureaus' Letter Agreement with ExxonMobil and, thus, it is beyond question that the Letter Agreement was not "properly executed on behalf of" the Port. *See id.* Nor may the Letter Agreement be construed, even liberally, as "providing goods or services" to the Port. *See id.* Therefore, because the Port did not enter into a contract subject to the 2005 legislation, the provision that perpetuates former immunity waivers *as to claims governed by subchapter I* does not apply here. *See* Act of May 23, 2005, 79th Leg., R.S., ch. 604, § 2, 2005 Tex. Gen. Laws 1548, 1549.

▮ Second, we cannot accept the premise of Father's argument that, when the lawsuit was filed in 2002, *Missouri Pacific* had already waived the Port's immunity.[8] It is for the Legislature, not the judiciary, to waive a governmental entity's immunity to suit. *IT–Davy*, 74 S.W.3d at 854. Thus, in *Missouri Pacific*, the Texas Supreme Court did not create a separate *judicial* exception to waiver, but rather interpreted a "sue and be sued" statute as a *legislative* waiver of immunity. *Missouri Pacific*, 453 S.W.2d at 813. In *Tooke*, the Texas Supreme Court recognized that its previous statutory construction in *Missouri Pacific* "is simply incorrect," and that the Legislature's use of the words "sue and be sued" does not clearly and unambiguously waive immunity. *Tooke*, 197 S.W.3d at 342. Thus, when the Seureaus filed their lawsuit in 2002, the Legislature had not waived the Port's immunity by using "sue and be sued" language in statutes governing navigation districts. *See id.* Even had *Tooke* effected a change in the law, the Texas Supreme Court's decision applies retroactively. *See Bowen v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 100 (Tex.1992); *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 162 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *see also Whole Foods Mkt. Sw., L.P. v. Tijerina*, 979 S.W.2d 768, 773 (Tex.App.-Houston [14th Dist.] 1998, pet. denied) (requiring courts to render decisions in light of changes in law).

Third, even before *Tooke* was issued in 2006, there was considerable debate among Texas courts as to whether the

---

**8.** The Thirteenth Court of Appeals recently rejected a similar argument:

> Rancho first contends that the Easement Agreement at issue was executed prior to *Tooke* and that the law as elucidated in *Mo. Pac.* therefore controls. We disagree. A decision of the supreme court operates retroactively unless the court exercises its discretion to modify that application....
>
> ....
>
> Immunity was not waived with respect to the claim at issue prior to September 1,

2005. Finding no evidence that the supreme court modified the general rule that its decision in *Tooke* should be applied retroactively, we conclude that the *Tooke* decision does apply to the instant case and that the words "sue or be sued" ... do not, by themselves, waive governmental immunity. *Valley Mun. Util. Dist. No. 2 v. Rancho Viejo, Inc.*, No. 13–07–00545–CV, 2008 WL 384320, at *3 (Tex.App.-Corpus Christi Feb. 14, 2008, no pet.) (mem.op.) (citations omitted).

words "sue and be sued," or similar language, by themselves waived immunity. *See Tooke,* 197 S.W.3d at 338–39 (surveying appellate courts' response to *Missouri Pacific*); *Tomball Hosp. Auth.,* 178 S.W.3d at 251–52 (same). In overruling *Missouri Pacific,* the Texas Supreme Court noted the varying treatment of its authority by Texas appellate courts, and concluded that "[b]ecause the phrase means different things in different statutes, it cannot be said to be clear and unambiguous." *Tooke,* 197 S.W.3d at 342. Thus, we cannot accept Father's contention that in 2002 there was "no doubt" that the Legislature had waived the Port's immunity from suit.

Accordingly, we hold that the "sue and be sued" language found in chapters 61 and 62 of the Texas Water Code does not clearly and unambiguously waive the Port's immunity from suit.

### D. Joint Enterprise

■ Alternatively, Father contends that the Port's governmental immunity is waived because, under the theory of joint enterprise, the Port should be held responsible for ExxonMobil's alleged wrongdoing. Generally, the theory of joint enterprise imputes liability to one who did not do wrong, but who is so closely connected to an active wrongdoer as to justify the imposition of vicarious liability. *See Esquivel v. Murray Guard, Inc.,* 992 S.W.2d 536, 541 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Father contends that the Texas Supreme Court has recognized joint enterprise as an independent basis for waiver of governmental immunity, citing *Texas Department of Transportation v. Able,* 35

S.W.3d 608 (Tex.2000). We disagree with this expansive reading of *Able.*[9]

*Able* arose from a personal-injury lawsuit filed by the surviving relatives and estate of Margaret Able, who was killed when her automobile was struck head-on by a vehicle driving the wrong direction in the same HOV lane. *Id.* at 610. The plaintiffs sued the Texas Department of Transportation ("TxDOT") and the Houston Metropolitan Transit Authority ("Metro"), among others, for negligence and gross negligence. *See id.* The jury found Metro—but not TxDOT—negligent, and likewise found that TxDOT had entered into a joint enterprise with Metro. *See id.* TxDOT appealed, arguing that sovereign immunity had not been waived. *See id.* at 610–11. However, the Legislature had provided for limited waiver of sovereign immunity for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem.Code Ann. § 101.021(2) (Vernon 2005). Because the Legislature had expressly consented to a personal-injury suit against a governmental entity, the theory of joint enterprise would prevent TxDOT from escaping liability:

> Here the trial court found a waiver of sovereign immunity because of the jury's finding that there was a joint enterprise. Because the jury found that TxDOT was not individually negligent for a premises defect, TxDOT can only be liable if the joint enterprise finding *brings the liability within the waiver of*

---

9. For the purposes of this appeal, we will assume, without deciding, that the theory of joint enterprise extends beyond negligence claims to include the Seureaus' fraud and contract allegations. *See Shoemaker v. Estate of Whistler,* 513 S.W.2d 10, 16–17 (Tex.1974)

(adopting Restatement formulation of joint enterprise); Restatement (Second) of Torts § 491(1) & cmts. (1965) (imputing responsibility "for physical harm to other persons caused by the *negligence* of any member") (emphasis added).

*sovereign immunity language in the Tort Claims Act.* Section 101.021(2) waives liability for a governmental unit if "the governmental unit would, were it a private person, be liable to the claimant according to Texas law." We have stated in the context of private parties that "the theory of joint enterprise is to make each party thereto the agent of the other and thereby to hold each responsible for the negligent act of the other." If there is a joint enterprise here between Metro and TxDOT, and if TxDOT would have been liable for Metro's negligence had TxDOT been a private person, then we must conclude that the State has waived its immunity and that TxDOT is liable *under the plain meaning of section 101.021(2).*

*Able,* 35 S.W.3d at 613 (citations omitted) (emphasis added). Thus, the *Able* court utilized joint enterprise not as an *independent* basis for waiver but, rather, to "bring the liability within" the waiver provisions of the Tort Claims Act. *See id.* This result comports with the well-known principle that the Legislature—through statute or resolution—waives immunity from suit, and not the courts through the application of common-law theories. *See IT–Davy,* 74 S.W.3d at 854.

 Unlike in *Able,* the Legislature has not waived the Port's governmental immunity from suit. *Able* involved statutory waiver under the Tort Claims Act, but the Seureaus concede that their fraud and contract claims fall outside of the Tort Claims Act. *See* Tex. Civ. Prac. & Rem.

Code Ann. § 101.021 (waiving immunity for property damage, personal injury, and death under certain conditions); *City of Fort Worth v. Pastusek Indus., Inc.,* 48 S.W.3d 366, 372 (Tex.App.-Fort Worth 2001, no pet.) (holding that Legislature did not waive immunity for fraud and contract claims). Nor has the Legislature *elsewhere* waived the Port's immunity against the Seureaus' claims. As is discussed above, the contract claim does not fall within the auspices of the waiver provisions of the Local Government Code. *See* Tex. Loc. Gov't Code Ann. § 271.151, *et seq.* Although the Legislature has provided for an administrative remedy for certain breach-of-contract cases, the statutory provisions would not apply to the Letter Agreement, which was executed before August 30, 1999. *See IT–Davy,* 74 S.W.3d at 856.[10] Finally, the Legislature has not waived immunity with respect to the intentional tort of fraud.[11] *See Pastusek Indus.,* 48 S.W.3d at 372; *Ethio Express Shuttle Serv., Inc. v. City of Houston,* 164 S.W.3d 751, 757–58 (Tex.App.-Houston [14th Dist.] 2005, no pet.); *City of Houston v. Petroleum Traders Corp.,* 261 S.W.3d 350, 361 (Tex.App.-Houston [14th Dist.] 2008, rule 53.7(f) motion granted). Accordingly, we hold that, absent legislative consent to suit, the common-law theory of joint enterprise, by itself, does not waive a governmental entity's immunity from suit. *See Able,* 35 S.W.3d at 613.

Moreover, as is discussed below, we hold that the evidence fails to demonstrate a joint enterprise by the Port and ExxonMo-

---

**10.** *See also* Act of May 27, 2001, 77th Leg., R.S., ch. 1422, § 14.11, 2001 Tex. Gen. Laws 5021, 5067.

**11.** In fact, the Legislature has unambiguously stated that, for example, the Tort Claims Act does not waive immunity for intentional torts. *See* Tex. Civ. Prac. & Rem.Code Ann. § 101.057(2). Because the Seureaus' claims

are not among those contemplated by the Tort Claims Act, Father contends that section 101.057 likewise does not proscribe his fraud claims. However, the burden is on the plaintiff to demonstrate legislative consent to suit, and not on the governmental entity to show that such claims are precluded. *See IT–Davy,* 74 S.W.3d at 855.

bil to acquire the land subject to the 1966 Letter Agreement.

### E. Waiver by Conduct

In 1997, the Texas Supreme Court held that a governmental entity does not waive immunity from a breach-of-contract suit simply by entering into a contract for goods and services. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex.1997). In a footnote, Justice Baker's majority opinion suggested that "[t]here may be other circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts." *Id.* at 408 n. 1. Justice Hecht concurred, offering that "today's decision does not hold that the State is always immune from suit for breach of contract absent legislative consent; it holds only that the mere execution of a contract for goods and services, without more, does not waive immunity from suit." *Id.* at 413 (Hecht, J., concurring). Relying on the footnote, several courts of appeals opted to recognize a judicially imposed, equitable waiver of immunity from suit. *Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 595 (Tex.2001). Those courts concluded that the State waives immunity from a breach-of-contract suit if it accepts benefits under a contract for goods or services. *See id.*

But in 2002, Justice Baker, writing for a plurality of four justices, insisted that no such "waiver by conduct" exception exists:

> We again reaffirm that it is the Legislature's sole province to waive or abrogate sovereign immunity.... Creating a waiver-by-conduct exception would force the State to expend its resources to litigate the waiver-by-conduct issue before enjoying sovereign immunity's protections—and this would defeat many of the doctrine's underlying policies.
>
> .... Because we have consistently held that only the Legislature can waive sovereign immunity from suit, allowing other governmental entities to waive immunity by conduct that includes accepting benefits under a contract would be fundamentally inconsistent with our established jurisprudence.... Accordingly, we reject IT–Davy's argument that we should fashion such a waiver-by-conduct exception in a breach-of-contract suit against the State.

*IT–Davy*, 74 S.W.3d at 857 (citations omitted). Justice Hecht, writing a concurring opinion for a plurality of four justices, found no waiver because *IT–Davy* presented "nothing more than an ordinary contract dispute," but refused to foreclose altogether the possibility of a waiver-by-conduct exception in a subsequent lawsuit. *See id.* at 860–61 (Hecht, J., concurring). In a dissenting opinion, Justice Enoch admonished his colleagues for continuing to offer "false hope" to litigants by failing to outline the parameters that constitute waiver by conduct:

> Oddly, Justice Hecht, rather than join Justice Baker, offers hope that there remains another key—a magic key that will loosen sovereign immunity's lock and open the courthouse doors. But it is false hope. He is unable to identify and can give only vague clues about what that key may look like. This just encourages endless, fruitless litigation as each new contracting party, thinking it has discovered the key, seeks to open the courthouse door.... [IT–Davy] will learn from this Court that, alas, it didn't have the magic key.

*Id.* at 863 (Enoch, J., dissenting).

Although the Texas Supreme Court has yet to find, much less define, waiver by conduct, the Court has strongly hinted that equitable concerns would come into play:

In *Federal Sign,* we noted that there might be circumstances "where the State may waive its immunity by conduct other than simply executing a contract," although under the facts of that case, it was not necessary to indicate what those circumstances might be. Since *Federal Sign,* we have had several occasions to consider circumstances that were urged to constitute a waiver by conduct. We held that the facts these cases presented did not support an *equitable waiver by conduct* of the governmental entities' immunity.

*Catalina Dev., Inc. v. County of El Paso,* 121 S.W.3d 704, 705 (Tex.2003) (citations omitted) (emphasis added). Finding that the governmental entity "did not profit unfairly" at the expense of the party with which it contracted, the Court held that "the equitable basis for such a waiver simply does not exist under this set of facts." *Id.* at 706. Instead of adopting a categorical approach or bright-line rule, it appears that courts are to evaluate the waiver-by-conduct exception on the facts and equity of each case. *See Tex. S. Univ. v. State Street Bank & Trust Co.,* 212 S.W.3d 893, 907 (Tex.App.-Houston [1st Dist.] 2007, pet. denied).

Last year, the First Court of Appeals found that under "extraordinary factual circumstances" a governmental entity engaged in conduct so inequitable and egregious as to waive its immunity. *See id.* at 907–08. Texas Southern University had contractually agreed to lease physical-plant equipment from CMS Viron Corporation. *See id.* at 897. Attached as an exhibit to the Master Lease between TSU and Viron was an opinion letter authored by TSU's general counsel, upon which Viron was entitled to rely. *See id.* at 898. The opinion letter assured Viron that the Master Lease was legal, valid, binding, and enforceable, and that, in the event of a judgment for money damages, TSU would be "obligated to pay" any judgment. *See id.* After Viron installed the equipment, however, TSU announced that the Master Lease was void and unenforceable. *See id.* at 898, 899. After Viron filed suit, TSU then attempted to invoke sovereign immunity. *See id.* at 897. The appellate court found waiver by conduct:

> [Viron] argues ... that "the injustice is even worse, because this case also includes an additional fact that appears in none of the prior [immunity] cases: The government officials lured Viron into the Master Lease with false promises that the contract would be valid and enforceable, then disclaimed any obligation on the contract by taking the position that the contract was not valid after all."
>
> We agree. Based on the facts before us, we ... hold that sovereign immunity does not defeat the trial court's subject-matter jurisdiction over Viron's claims for breach of contract.

*Id.* at 908.

In this case, Father attempts to analogize the Port's conduct to TSU's in *State Street,* and asserts that he, too, carries the "magic key" to unlock the courthouse doors. *See IT–Davy,* 74 S.W.3d at 863 (Enoch, J., dissenting). He does not. We will discuss his specific allegations below; generally, he asserts that the Port (1) engaged in a joint enterprise with ExxonMobil to acquire the Seureaus' lands; (2) enjoyed benefits from the 1966 Letter Agreement used to acquire those lands; (3) refused to honor the obligations owed by its joint-enterprise agent under the Letter Agreement; and (4) tried to exercise its eminent-domain powers inequitably.

**1. Joint Enterprise Allegations:**

Appellants have alleged that:

• Although the Port was not a party to the 1966 Letter Agreement, the Port was engaged in a joint enterprise with ExxonMobil, which was a party to the Letter Agreement; and

• Pursuant to the 1964 Basic Agreement, ExxonMobil would acquire the lands necessary to construct the Project, and convey those lands to the Port.

We must reject these allegations because the evidence submitted by the parties reflects no joint enterprise to acquire the land covered by the 1966 Letter Agreement but, rather, to develop the Bayport project on land ExxonMobil had already acquired in 1960. The essential elements of a joint enterprise, which interrelate, require (1) an agreement, express or implied, among the group members; (2) a common purpose to be carried out by the group; (3) a "community of pecuniary interest" in that common purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, giving rise to an equal right of control over the enterprise or project formed to carry out that purpose. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 526–28 (Tex.2002); *Shoemaker v. Estate of Whistler,* 513 S.W.2d 10, 16–17 (Tex.1974). Thus, the joint-enterprise elements must exist with respect to the *same* purpose and enterprise. *St. Joseph Hosp.,* 94 S.W.3d at 529.

This principle takes on added significance in a case in which the members of the claimed joint enterprise have a more complicated, ongoing relationship. *See id.* In such a case, the evidence may demonstrate numerous agreements arising from an assortment of common purposes, thus leading to "a number of possible projects or 'enterprises' devoted to carrying them out." *Id.*

Turning to the evidence, we conclude that ExxonMobil and the Port had an agreement and a common purpose to develop the Project on 720 acres that ExxonMobil conveyed to the Port in 1964, and which included the 259–acre tract which Grandfather sold to ExxonMobil in 1960.[12] However, the 1964 Basic Agreement did not contemplate that the Project would extend beyond the original 720 acres and certainly did not call for ExxonMobil to acquire the lands subject to the 1966 Letter Agreement. The only suggestion of development outside the 720 acres was a clause under which ExxonMobil, at its own cost and outside of the 720 acres, could supply pipelines, storage tanks, and facilities for the transportation and storage of bulk commodities. This clause does not contemplate the Port's involvement in any such endeavor and, in fact, recites that ExxonMobil would bear all costs associated with development outside of the 720 acres. The Letter Agreement supports the notion that ExxonMobil was not acting in furtherance of the claimed joint enterprise in acquiring the 1966 lands: "[ExxonMobil] is interested in the development of its Bayport properties. It has been disclosed to us that there is opportunity for the location of an *iron ore processing plant* in the area and that this may call for the deepening of the existing Bayport channel."[13]

Nor does the evidence reveal any community of pecuniary interest in ExxonMobil's acquisition of the 1966 lands. A "community of pecuniary interest" requires that the members of the group share, "without special or distinguishing

---

12. In his brief, Father contends that the Port and ExxonMobil knew that the original 720 acres would be insufficient to accomplish the Master Plan and had intended to acquire additional lands; however, these suspicions are not borne out by facts in the record.

13. Emphasis added.

characteristics," a monetary interest in the enterprise's common purpose. *See id.* at 531 (citation omitted). That both the Port and ExxonMobil may have stood to derive a monetary benefit from the Bayport project does not satisfy this element. *See id.* at 532. Rather, there must be evidence that such monetary benefits were to be shared between the Port and ExxonMobil, without special or distinguishing characteristics. *See id.* There is no evidence of such an arrangement here with respect to the group's common purpose, that is, development of the Bayport project on the original 720 acres.

We conclude that there was no agreement, common purpose, community of pecuniary interest, or equal right to control, with respect to the possible acquisition or development of additional lands beyond the original 720 acres, including the lands addressed by the 1966 Letter Agreement. Accordingly, we decline to apply the doctrine of joint enterprise. *See id.* at 528.

## 2. Accepting Benefits from the Letter Agreement:

 Father uses his joint-enterprise argument as a springboard to contend further that the Port waived its immunity by engaging in the following inequitable conduct:

- The Port benefited from ExxonMobil's fraud by taking title to the Seureaus' lands while knowing of ExxonMobil's obligations under the Letter Agreement; and

- The Port benefited from the Seureaus' obedience to its Letter Agreement with ExxonMobil, because the Seureaus did not develop their remaining lands and, accordingly, the Port was able to pay a lower condemnation price for the remaining lands when it exercised its eminent-domain powers.

We have already determined that no joint-enterprise relationship existed between the Port and ExxonMobil with respect to the 1966 Letter Agreement and the rights and obligations contained therein. Even assuming, *arguendo,* that the Port enjoyed benefits from the Letter Agreement, the Texas Supreme Court has consistently held that a governmental entity does not waive immunity from suit by accepting the benefits of a contract. *See Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 840 (Tex.2007); *Little–Tex,* 39 S.W.3d at 598; *Catalina Dev. Inc.,* 121 S.W.3d at 705–06; *Travis County v. Pelzel & Assocs., Inc.,* 77 S.W.3d 246, 248 (Tex.2002); *IT–Davy,* 74 S.W.3d at 860. We decline the invitation to depart from these authorities and therefore re-affirm that, even if the Port derived benefits from a contract to which it was not a party, the Port did not thereby waive its immunity from suit.

## 3. Refusal to Perform ExxonMobil's Obligations:

Father contends that in 1971, the Port "secretly acknowledg[ed] the Seureaus' contractual development rights" in the remaining properties. Again relying on the incorrect legal assumption that the Port is bound by the Letter Agreement through joint enterprise, Father asserts that the Port's refusal to honor ExxonMobil's contractual obligations should result in an equitable waiver of its immunity from suit. Specifically, he has alleged that:

- The Port refused to trade the Hollier tract for the Triangular tract in 1998; and

- The Port, by condemning the remaining lands in 2002, prevented the Seureaus from realizing the economic profit from development that was contemplated in the Letter Agreement.

The record does not evince the Port's agreement, express or implied, to honor any of ExxonMobil's obligations imposed

by the Letter Agreement. The 1971 "acknowledgment" to which Seureau refers consists of a written *proposal*, prepared by ExxonMobil, under which the Port would honor ExxonMobil's "certain obligations to Glenn E. Seureau, et al, ... with respect to development of land in the area." However, the Port responded to the proposal by expressly declining to assume ExxonMobil's obligations to Seureau, and the eventual pact struck between the Port and ExxonMobil omits any such assumption of obligations. In July 1998, then, when pressed by the Seureaus, the Port did not agree to be bound by the Letter Agreement.

■ Even were the Port obligated by ExxonMobil's contractual obligations, a governmental entity's immunity *from suit* is not waived merely because the entity breaches a contract. "When the State contracts, it is liable on contracts made for its benefit as if it were a private person. Consequently, when the State contracts with private citizens it waives immunity from liability. But the State does not waive immunity from suit simply by contracting with a private person." *Little–Tex*, 39 S.W.3d at 594 (citations omitted); *Slade v. Tex. S. Univ. Bd. of Regents*, 232 S.W.3d 395, 400 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (upholding immunity from suit despite plaintiff's pleading of facts potentially demonstrating breach of contract by governmental entity).

One of the reasons that courts defer to the Legislature to waive immunity from suit is so that the Legislature may revise existing agreements if doing so would benefit the public. *IT–Davy*, 74 S.W.3d at 854. Thus, legislative control ensures that current policymakers are neither bound by, nor held accountable for, their predecessors' rationale for entering into long-term contracts. *See id.* For this reason, finding waiver by conduct merely because the plaintiff alleges that the governmental entity breached the contract would render immunity useless by permitting the exception to swallow the rule.

**4. Inequitable Use of Eminent Domain:**

■ As of July 1998, the Port was aware of the existence of the Letter Agreement. While the Port did not agree to be bound by the Letter Agreement, the Port was intrigued by a portion of it that contemplated a swap of the Hollier tract—which had since come into the Port's possession—for the Seureaus' Triangular tract:

> If the A.M. Hollier tract is acquired by [ExxonMobil] as a part of the additional land and a portion thereof is made available to us under the foregoing provisions hereof, Glenn E. Seureau agrees, subject to the following condition, to convey to [ExxonMobil], at its request, the tract in the form of a triangle containing approximately 13 acres, more or less.... This obligation to convey shall be conditioned upon there being a specific commitment by [ExxonMobil] or some governmental authority to construct an all-weather road on the triangular tract and along the eastern boundary thereof which will provide road frontage to the land retained by us. This exchange of the triangular tract shall be on an acre per acre basis[.]

Father alleges that the Port proposed the land swap with the intent to then exercise its eminent-domain powers to re-take the traded-away Hollier tract, thereby acquiring both properties. However, the proposed deal did not come to pass because the Seureaus, who remained wary of the Port's motives, refused to consummate the trade unless the Port would waive eminent domain. The Port's refusal to do so, Father continues, demonstrates inequitable

conduct justifying waiver of the Port's immunity from suit. We disagree.

▮▮▮▮ A governmental entity may not agree to a contract provision that would limit the free exercise of its governmental powers. *See City of Corpus Christi v. Taylor*, 126 S.W.3d 712, 719 (Tex.App.-Corpus Christi 2004, pet. withdrawn); *Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 391 (Tex. 1977). The power of eminent domain or condemnation is such a governmental function that cannot be delegated or restricted by contract. *See City of Corpus Christi*, 126 S.W.3d at 719. Thus, a contract that restricts a governmental entity's freedom to decide whether to initiate eminent domain or condemnation proceedings would be illegal and void. *Id.* The Port's refusal to waive its eminent-domain powers, then, was appropriate and not inequitable. *See id.* Thus, we cannot conclude that the Port waived its immunity from suit by simply offering to trade the Hollier tract for the Triangular tract, without waiving its eminent-domain powers.

Moreover, the Seureaus—who rejected the proposal—have not demonstrated that by merely offering to swap land tracts, the Port profited unfairly at their expense. *See Catalina Dev., Inc.*, 121 S.W.3d at 706; *see also IT–Davy*, 74 S.W.3d at 861 (Hecht, J., concurring) ("My hypothetical [in *Federal Sign* ] supposed a governmental entity that chiseled a contractor just because it could get away with doing so."). In a general sense, waiver involves an "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex.2003) (citations omitted). Thus, one can envision waiver by conduct where, for example, the governmental entity lures one into a contract by promising that the contract would be enforceable, legal, valid, and binding,

and that the governmental entity would be obligated to pay damages for breaching same. *See, e.g., State Street*, 212 S.W.3d at 898, 908. Such an example evinces an implied promise that the governmental entity has intentionally relinquished its right to claim immunity. *See generally id.* This case does not involve the type of "extraordinary circumstances" present in *State Street.* Waiver by conduct is not warranted in ordinary contract disputes. *See Slade*, 232 S.W.3d at 400; *IT–Davy*, 74 S.W.3d at 861 (Hecht, J., concurring). Thus, we are disinclined to extend waiver by conduct to a case that does not even involve a contract with a governmental entity.

Accordingly, we affirm the trial court's order granting the Port's plea to the jurisdiction and dismissing, for lack of subject-matter jurisdiction, the Seureaus' claims against the Port.

## STATUTE OF LIMITATIONS

The Seureaus contend further that the trial court erred in granting ExxonMobil's motion for summary judgment. Where, as here, the trial court does not specify the basis for its grant of summary judgment, the appealing party must demonstrate that the trial court erred in basing it on any ground asserted in the motion. *Chappell Hill Bank v. Smith*, 257 S.W.3d 320, 324 (Tex.App.-Houston [14th Dist.] 2008, no pet.). Therefore, we will affirm the summary-judgment order if any of the grounds advanced in the motion has merit. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001); *Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 610 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). A defendant moving for summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action, or conclusively establish each element of an

affirmative defense. *Shirvanian v. DeFrates,* 161 S.W.3d 102, 106 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). We review a grant of summary judgment de novo, using the same summary-judgment standard employed by the trial court. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Duerr v. Brown,* 262 S.W.3d 63, 68–69 (Tex.App.-Houston [14th Dist.] 2008, no pet.). That is, we take as true all evidence favorable to the non-movant. *Chappell Hill Bank,* 257 S.W.3d at 324. We must also indulge every reasonable inference, and resolve all doubts, in the non-movant's favor. *Id.*

In its motion for summary judgment, ExxonMobil argued that the Seureaus' claims for fraud and breach of contract are time-barred by the applicable four-year statute of limitations, having accrued no later than July 1998. In response, the Seureaus—who filed suit in August 2002— instead urge a May 2002 accrual date, and have invoked the discovery rule and the doctrine of fraudulent concealment. Because we hold that ExxonMobil conclusively established its affirmative defense of limitations, we affirm the trial court's summary-judgment order.

### A. Accrual

A defendant who seeks summary judgment on the basis of limitations must conclusively prove when the plaintiff's cause of action accrued. *See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). "Accrual" refers to the date when a limitations period begins to run. *See XCO Prod. Co. v. Jamison,* 194 S.W.3d 622, 634 (Tex. App.-Houston [14th Dist.] 2006, pet. denied). The date that an action accrues is a question of law. *See Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990).

Because no statute defines the accrual date for the Seureaus' breach-of-

contract and fraud claims, we look to the legal-injury rule to determine the accrual date. *See KPMG,* 988 S.W.2d at 750; *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex.1996). Under the legal-injury rule, a cause of action generally accrues when a wrongful act causes some legal injury, regardless of when the plaintiff learns of the injury, and even if all resulting damages have not yet occurred. *S.V.,* 933 S.W.2d at 4. A legal injury consists of any invasion to the claimant's legally protected interest. *Goggin v. Grimes,* 969 S.W.2d 135, 137 (Tex.App.-Houston [14th Dist.] 1998, no pet.). Stated differently, a cause of action generally accrues when facts come into existence which authorize a claimant to seek a judicial remedy. *Trail Enters., Inc. v. City of Houston,* 957 S.W.2d 625, 631 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). When the defendant's conduct produces a legal injury, however slight, the cause of action accrues and the statute of limitations begins to run. *See Childs v. Haussecker,* 974 S.W.2d 31, 41 n. 7 (Tex.1998); *Goggin,* 969 S.W.2d at 137.

### 1. Fraud

Texas law prescribes a four-year statute of limitations for fraud actions, including claims for fraudulent concealment. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a) (Vernon 2002); *Williams v. Khalaf,* 802 S.W.2d 651, 658 (Tex.1990); *Teco–Westinghouse Motor Co. v. Gonzalez,* 54 S.W.3d 910, 912 n. 2 (Tex. App.-Corpus Christi 2001, no pet.). A cause of action for fraud accrues on the date that the defendant makes the allegedly false representations. *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988); *Hoover v. Gregory,* 835 S.W.2d 668, 676 (Tex.App.-Dallas 1992, writ denied).

Appellants' fraud claims arise from promises that ExxonMobil is alleged to have made when the Letter Agreement

was executed on April 12, 1966. Thus, the Seureaus' cause of action for fraudulent inducement accrued no later than April 12, 1966, the date that the allegedly false representations were made. Unless saved by the discovery rule or the doctrine of fraudulent concealment, appellants' fraud claims are time-barred as they were not first asserted until August 2002, well more than four years after they accrued.

### 2. Breach of Contract

 Similarly, the statute of limitations for breach-of-contract actions is four years from the date of accrual. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.051 (Vernon 2008); *Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex.2002). It is well-settled that an action for breach of contract accrues immediately upon breach. *Barker v. Eckman,* 213 S.W.3d 306, 311 (Tex.2006); *Stine,* 80 S.W.3d at 592. A breach of contract occurs when a party fails or refuses to do something he has promised to do. *Mays v. Pierce,* 203 S.W.3d 564, 575 (Tex.App.-Houston [14th Dist.] 2006, pet. denied); *Townewest Homeowners Ass'n, Inc. v. Warner Commc'n, Inc.,* 826 S.W.2d 638, 640 (Tex.App.-Houston [14th Dist.] 1992, no writ).

Appellants' contract allegations may be lumped together in two general categories: the development claims and the land-transfer claims. The development claims encompass ExxonMobil's promise to assist in the development of the Seureaus' remaining lands and in obtaining rights-of-way, connections, and private access to any second channel that might be brought into the Bayport area. The Seureaus allege that the development claims were breached immediately upon execution of the 1966 Letter Agreement, because ExxonMobil had no right to control development of the Bayport project under the 1964 Basic Agreement, which afforded all such control to the Port alone.

The land-transfer claims arise from (1) the clause proposing the Hollier–for–Triangular–tract swap, and (2) ExxonMobil's contractual promise to offer any "surplus" land to the Seureaus for re-purchase. These contract provisions must have been breached, if at all, no later than October 27, 1997, when ExxonMobil transferred all of its remaining interest in the Bayport project, including the land acquired from the Seureaus in 1966, to the Port.

According to the appellants' own pleadings, then, some of their contract claims (*i.e.,* the development claims) accrued on April 12, 1966, with the remainder of their claims (*i.e.,* the land-transfer claims) accruing no later than October 27, 1997. *See Stine,* 80 S.W.3d at 592. Unless the discovery rule or doctrine of fraudulent concealment applies, their cause of action for breach of contract is time-barred, having been filed more than four years after the date their claims accrued. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.051.

### B. Discovery Rule and Fraudulent Concealment

 In rare cases where the nature of the injury is inherently undiscoverable and evidence of the injury is objectively verifiable, courts have recognized the discovery rule as an exception to the general accrual rule. *See, e.g., Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996). The discovery rule is a very limited exception to limitations and is construed strictly. *See id.; S.V.,* 933 S.W.2d at 25 (noting that applications of discovery rule "should be few and narrowly drawn"). The rule has been limited to matters that are properly characterized as inherently undiscoverable. *Johnson v. Abbey,* 737 S.W.2d 68, 69–70 (Tex.App.-Houston [14th Dist.] 1987, no writ). An injury is inherently undiscoverable if, by its very nature, it is unlikely to be discovered with-

in the prescribed limitations period *despite the exercise of due diligence. Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734–35 (Tex.2001). Whether an injury is inherently undiscoverable is determined on a categorical basis, because such an approach "brings predictability and consistency to the jurisprudence." *See Apex Towing Co. v. Tolin,* 41 S.W.3d 118, 122 (Tex.2001). Thus, the focus is on whether a *type* of injury, rather than a *particular* injury, was discoverable. *Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 314 (Tex.2006).

Where the discovery rule applies, the cause of action accrues when the plaintiff knows, or through the exercise of reasonable care and diligence should have discovered, the nature of his injury and the likelihood that it was caused by the wrongful acts of another. *See Childs,* 974 S.W.2d at 40. Thus, accrual is not delayed until the plaintiff learns of actual causes and possible cures for his injuries. *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 93 (Tex. 2004). Instead, a plaintiff who invokes the discovery rule still must have sought information about his injuries and their likely cause once apprised of facts that would prompt a reasonably diligent person to make an inquiry that would lead to discovery of the cause of action. *Pirtle v. Kahn,* 177 S.W.3d 567, 571 (Tex.App.-Houston [1st Dist.] 2005, pet. denied).

If, as here, the plaintiff pleads the discovery rule as an exception to limitations, the defendant moving for summary judgment must negate it. *KPMG,* 988 S.W.2d at 748. This may be done by demonstrating that the discovery rule does not apply or by proving, as a matter of law, that there is no genuine issue of material fact as to when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of his injury. *Childs,* 974 S.W.2d at 44.

Although similar in effect to the discovery rule, the fraudulent-concealment doctrine is an affirmative defense to limitations that resembles equitable estoppel. *Trousdale v. Henry,* 261 S.W.3d 221, 235 (Tex.App.-Houston [14th Dist.] 2008, rule 53.7(f) motion granted); *Autry v. Dearman,* 933 S.W.2d 182, 192 (Tex.App.-Houston [14th Dist.] 1996, writ denied). This doctrine estops a defendant from relying on the defense of limitations if the defendant was under a duty to make a disclosure but fraudulently concealed the existence of a cause of action from the party to whom it belongs. *Ponder v. Brice & Mankoff,* 889 S.W.2d 637, 645 (Tex.App.-Houston [14th Dist.] 1994, writ denied). To prove fraudulent concealment, the plaintiff must demonstrate that the defendant had (1) actual knowledge that a wrong occurred, (2) a duty to disclose the wrong, and (3) a fixed purpose to conceal the wrong. *McMahan v. Greenwood,* 108 S.W.3d 467, 493 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances that would cause a reasonably prudent person to make inquiry which, if pursued, would lead to the discovery of the concealed cause of action. *Ponder,* 889 S.W.2d at 645. This is the same standard that applies to the discovery rule. *Trousdale,* 261 S.W.3d at 235.

### C. Application to Facts

#### 1. Fraud and Contract–Development Claims

Appellants' fraud claims are premised upon their contention that ExxonMobil, either directly or through a land map presented to the Seureaus, fraudulently overstated the extent of its ability to control the development of the Bayport

project.[14] Appellants agree that Exxon-Mobil's actual ability to influence Bayport development, or lack thereof, is demonstrated by the 1964 Basic Agreement. Father testified that he had "assumed that there were [written] agreements in cooperation between the Port and [ExxonMobil]," and he agreed that he could have requested information about such written agreements "if it occurred to him." Had the Seureaus reviewed the 1964 Basic Agreement, Father testified that they would not have proceeded with the 1966 land sale because, in the Basic Agreement, Exxon-Mobil "apportioned away control away from themselves and even conveyed away the lands that we were depending upon them to use their leverage in ownership that we provided them earlier to the Port already, so they had no bargaining position, no leverage to be of help to us."

■■■ Generally, contracting parties are not fiduciaries. *Via Net,* 211 S.W.3d at 314. Accordingly, due diligence requires that each contracting party protect its own interests. *Id.* The exercise of due diligence may require that a party ask its contract partner for information needed to verify the other's contractual performance. *See id.; Wagner & Brown,* 58 S.W.3d at 735–36; *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 887 (Tex.1998). One who, as here, fails to ask for such information has not used due diligence. *See Via Net,* 211 S.W.3d at 314; *HECI,* 982 S.W.2d at 887–88. It is for this reason that the Texas Supreme Court has expressed concern about the use of the discovery rule in contract actions:

We do not hold today that the discovery rule can never apply to breach of contract claims. Our attempts to bring predictability and consistency to discovery rule jurisprudence have focused on types of injury, not causes of action. Some contract breaches may be inherently undiscoverable and objectively verifiable. But those cases should be rare, as diligent contracting parties should generally discover any breach during the relatively long four-year limitations period provided for such claims.

*Via Net,* 211 S.W.3d at 314–15 (citations omitted). Review of a document that Father assumed was in existence, and which he agrees he could have requested, would have enabled the Seureaus to discover their fraud claims and contract development claims. We therefore hold that these claims, and the Seureaus' legal injury, were not inherently undiscoverable through the exercise of diligence. *See Via Net,* 211 S.W.3d at 314. Therefore, the discovery rule does not apply to these fraud and contract-development claims.

Nor may appellants escape limitations through the doctrine of fraudulent concealment. That doctrine ceases to operate upon a party's discovery of facts, conditions, or circumstances that would cause a reasonably prudent person to inquire and discover the concealed cause of action. *See Ponder,* 889 S.W.2d at 645. The summary-judgment evidence reveals that the Seureaus were aware of such facts more than four years before they filed their lawsuit.

---

**14.** Allegedly, in 1966, ExxonMobil presented the Seureaus with a map that incorrectly identified ExxonMobil as owning several parcels of land that in fact belonged to the Port. Had the Seureaus known that the Port owned those properties, they contend that they would have discovered that ExxonMobil was powerless to perform its obligations under the Letter Agreement. For the purpose of this discussion, however, notwithstanding whatever ExxonMobil may have represented with respect to its land ownership, the Seureaus have conceded that a review of the 1964 Basic Agreement would have disclosed Exxon-Mobil's inability to control the development of the Bayport project.

As of the early 1960s, the Seureaus knew of the Port's involvement in the Bayport project. Grandfather had marketed the Seureaus' land for sale in a brochure that commented on the planned development. The brochure explained that the Port would be constructing the "new ship channel and turning basin," with the project to be financed by ExxonMobil. Then, beginning in 1967, the Seureaus clipped and retained a series of newspaper articles concerning the Bayport project. These articles consistently noted that *the Port* was in the process of constructing, and would then operate, both the Bayport channel and the neighboring harbor and port facilities. In addition, we note that the Letter Agreement authored by Grandfather, in which ExxonMobil was to assist the Seureaus in the development of their remaining land, repeatedly limits such obligations only "to the extent [ExxonMobil] can reasonably do so *consistently with its interests in Bayport.*" This oft-repeated conditional language expressly contemplates that ExxonMobil would have something less than complete control over the development of the Bayport project.

Thus, no later than January 1967, the Seureaus were on notice that their contract partner, ExxonMobil, did not have complete control over the Bayport development, and that the Port did have some degree of control over its construction and operation. The Seureaus had not contracted with the Port, however, and were reluctant to do so given the Port's eminent-domain powers. Given that their development rights hinged upon ExxonMobil's ability to influence the development, and the Seureaus' knowledge that such ability was limited to some extent, it was incumbent upon them to make reasonable inquiry into the nature of the relationship between ExxonMobil and the Port.

We therefore hold that the estoppel effect of fraudulent concealment, if any, ended many years before the Seureaus opted to bring suit. *See Ponder,* 889 S.W.2d at 645. Thus, the doctrine of fraudulent concealment does not relieve the Seureaus of the time-barring effects of limitations on their fraud and contract-development claims.

### 2. Land–Transfer Claims

■ The Seureaus have alleged that by transferring the land acquired from them to the Port, ExxonMobil breached its contractual promise to first offer such "surplus" land to them. In addition, they have noted that ExxonMobil failed to comply with the provision that contemplated trade of the Hollier tract for an equivalently-sized portion of the Triangular tract. We have described these two contract claims as the "land-transfer claims," both of which accrued no later than October 27, 1997.[15] To avoid the bar of limitations, then, the Seureaus—whose suit was filed in August 2002, more than four years later—must try to invoke the discovery rule or the doctrine of fraudulent concealment. We hold that neither doctrine operates to render their lawsuit timely.

In June 1998, appellants met with Brenda McDonald, the Port's real-estate manager. They were given a map showing that the Port, and not ExxonMobil, was planning to develop the "surplus" land that ExxonMobil was allegedly obligated to offer to them. Therefore, they were on notice that ExxonMobil had transferred its interest in the surplus land to the Port, allegedly in violation of its contractual obligation to first offer that land to them.

---

**15.** To the extent that ExxonMobil was required to offer to trade the Hollier tract for the Seureaus' Triangular tract, it would have breached that contractual duty, if at all, no later than October 27, 1997, by which time it no longer owned the Hollier tract.

Having learned that the Port had acquired the surplus land, appellants met with the Port's chairman, Ned Holmes, hoping to convince the Port to honor ExxonMobil's contractual promises. Certainly by the conclusion of that meeting, if not before, appellants knew that ExxonMobil had not, and would not, honor whatever obligations it might have owed under the Letter Agreement. About that meeting, Son testified as follows:

> I didn't ask [Holmes] the nature of the relationship [between the Port and ExxonMobil]. I—it was obvious to me that there was a very close relationship and that they were cooperating together and that the Port had come forward in the relationship and that *it was now in the position that Exxon Mobil or Humble had been in previously.*

Having discovered in June and July 1998 that ExxonMobil was not in a position to honor its land-transfer obligations to the Seureaus, any tolling or estoppel effect occasioned by the discovery rule or by fraudulent concealment would have ended then. *See Bell v. Showa Denko K.K.*, 899 S.W.2d 749, 754 (Tex.App.-Amarillo 1995, writ denied) (discovery rule); *Ponder,* 889 S.W.2d at 645 (fraudulent concealment). Their lawsuit was filed more than four years after July 1998, and appellants' contract land-transfer claims are time-barred.

Appellants argue for a May 2002 accrual date, at which time the Port instituted condemnation proceedings against their land. Until that time, the argument goes, appellants were unaware that the Letter Agreement would not be honored. This argument misses the point. No later than July 1998, appellants discovered that their contract partner, ExxonMobil, had withdrawn from the project and would not be assisting the Seureaus in developing their remaining land. To the extent that ExxonMobil was obligated by the Letter Agreement, its alleged failure to honor its obligations constituted an actionable breach of contract. *See Mays,* 203 S.W.3d at 575. Nothing that occurred after that point affected appellants' causes of action against ExxonMobil but, instead, relate to their dealings with a separate entity, the Port. That the Seureaus thereafter tried to convince the Port to undertake ExxonMobil's contract obligations does not excuse their failure to timely bring suit against ExxonMobil.

Accordingly, we affirm the trial court's summary judgment in favor of ExxonMobil. Having determined that the statute of limitations bars appellants' claims, we need not address the other grounds stated in ExxonMobil's motion for summary judgment. *See Dow Chem. Co.,* 46 S.W.3d at 242.

## CONCLUSION

We conclude that appellant Glenn Edouard Seureau has standing to maintain this appeal against the Port of Houston Authority. We hold, however, that his claims against the Port of Houston Authority are barred by governmental immunity. We further hold that the Seureaus failed to timely assert their claims against ExxonMobil, and that those claims therefore are barred by the statute of limitations.

Accordingly, we affirm the trial court's orders granting ExxonMobil's motion for summary judgment and the Port's plea to the jurisdiction.