Opinion issued December 31, 2009












     





In The
Court of Appeals
For The
First District of Texas




NO. 01-07-00491-CV




DERNICK RESOURCES, INC., Appellant

V.

DAVID WILSTEIN AND LEONARD WILSTEIN INDIVIDUALLY AND AS
TRUSTEE, Appellees

* * *

DAVID WILSTEIN AND LEONARD WILSTEIN INDIVIDUALLY AND AS
TRUSTEE, Appellants

V.

DERNICK RESOURCES, INC., Appellee





On Appeal from the 164th District Court
Harris County, Texas
Trial Court Cause No. 2002-31310




O P I N I O N

          Appellants David and Leonard Wilstein (the “Wilsteins”) were joint venturers
with Dernick Resources, Inc. (“Dernick”) under Joint Venture Agreements (JVA’s)
for a Nebraska gas field (the McCourt Field) and a Kansas oil and gas field (the
Bradshaw Field). The Wilsteins appeal the portion of the trial court’s judgment
holding that the statute of limitations bars them from asserting claims against Dernick
for (1) breach of a contractual right to be notified in writing of the opportunity to
participate in acquiring the remaining portion of the working interest in the McCourt
Field and (2) Dernick’s sale of the Wilsteins’ interest in the Bradshaw Field without
notice to the Wilsteins.
          In a cross-appeal against the Wilsteins, Dernick appeals the portion of the trial
court’s judgment awarding damages to the Wilsteins on their claims for fraud and/or
breach of fiduciary duty for loss sustained by the Wilsteins as a result of a volumetric
production payment (VPP)


 placed on the McCourt Field by Dernick that sold the
production from the field for a five-year period in exchange for a loan of cash to
purchase the remaining potion of the working interest. In four issues, Dernick argues
that (1) legally insufficient evidence supports the award of damages in favor of the
Wilsteins; (2) the trial court erred in holding that Dernick owed a fiduciary duty to the
Wilsteins; (3) the Wilsteins’ fraud non-disclosure recovery must be set aside because
Dernick owed no duty of disclosure to the Wilsteins; and (4) the trial court erred in
refusing to find that the Wilsteins’ claims for loss due to the VPP were barred by
limitations.
          We reverse and remand for further proceedings consistent with this opinion.
I. Background
          A. The McCourt Field Joint Venture
          Harry Dernick was the founder of Dernick, an oil and gas exploration and
production company, and a venturer with the Wilsteins in interests in oil and gas
properties. Due to Harry Dernick’s failing health, Stephen Dernick, Harry’s son, took
over the operation of Dernick.


 
          On August 30, 1991, the Wilsteins and Dernick entered into a joint venture
agreement (“the JVA”) whereby the Wilsteins agreed to advance money to Dernick
to acquire working interests in oil and gas properties in Nebraska known as the
McCourt Field and to conduct drilling and production operations on the leases (“the
McCourt Field JVA”). Under the terms of the JVA, the Wilsteins and Dernick
together owned 25% of the McCourt Field as tenants in common. The Wilsteins each
owned a 5% undivided working interest


 in the field, for a total interest of 10%, and
Dernick owned a 15% working interest as tenants in common. The remaining 75%
working interest in the field was owned by Snyder Oil Corporation (Snyder). 
          Each of the venturers had a proportionate undivided interest in the leases
acquired and each was required to contribute his proportionate share of all costs in
accordance with his percentage interest. Dernick undertook to pay and discharge out
of the capital of the Venture all costs and expenses incurred in the acquisition and
maintenance of the interest in the field and in drilling and completing wells, laying any
pipelines, and constructing wells. The costs and expenses were then charged to the
venturers in accordance with their percentages.
          The JVA gave Dernick the full right and authority to negotiate for the
acquisition of additional interests as the nominee of the venture and to execute all
documents, including operating agreements, purchase and sale agreements, and other
appropriate documents that it, in its discretion, deemed necessary or appropriate. The
JVA also made Dernick the agent and attorney in fact for the venturers. Although the
JVA expressly provided that the interest was owned by Dernick and the Wilsteins as
tenants in common and the relationship of the venturers and Dernick was that of co-owners, title to the interest of the venturers was maintained in the name of Dernick,
as nominee of the venture. Dernick was also given the right to enter a JOA on behalf
of the venture and to act as operator. 
          The JVA provided that if a venturer encumbered, transferred, or otherwise
disposed of his interest in the McCourt Field, the disposition must cover either (1) “the
entire interest of the venturer” in the field or (2) “an equal undivided interest” in the
field. The JVA further provided that if the interest of any venturer became “subject
to any . . . production payment or other charge over and above the Initial Lease
Burdens . . . such Venturer shall assume and alone bear all obligations with respect
thereto and shall account for them to the owners thereof out of his share of the
working-interest production from the [McCourt Field] properties” and that all such
lease burdens “shall be subordinate to this Agreement and to any applicable Operating
Agreement.” All encumbrances and other dispositions made by any venturer were
expressly made subject to the JVA, any applicable operating agreement, and any other
agreement entered into pursuant to the JVA.
          Snyder and Dernick executed the McCourt Field JOA on November 1, 1991. 
Snyder became the operator, and Dernick, as nominee and agent of the joint venture,
was a non-operator, as were the Wilsteins, through Dernick. The JOA provided, in
relevant part, that, if any party desired to sell all or part of its interest in the McCourt
Field, “it shall promptly give written notice to the other parties, with full information
concerning its proposed sale, which shall include the name and address of the
prospective purchaser (who must be ready, willing and able to purchase), the purchase
price, and all other terms of the offer.” The other parties then had “an optional prior
right,” for fifteen days after receipt of the notice to purchase “on the same terms and
conditions the interest which the other party proposes to sell.” If the optional right
were exercised, the JOA provided that “the purchasing parties shall share the
purchased interests in the proportions that the interest of each bears to the total interest
of all purchasing parties.”
B. The Purchase of Snyder’s Interest in the McCourt Field: The
Volumetric Production Payment

          In 1996, Snyder decided to sell its 75% interest in the McCourt Field, and it
honored the preferential right to purchase clause in the 1991 JOA by giving Dernick
written notice of the right to purchase Snyder’s interest for $3,056,000 in cash. Both
the McCourt Field JVA and the 1991 JOA required written notice of the terms and
conditions of the proposed sale to the other venturers when a party to the JOA desired
to sell all of its interest in the McCourt Field. The JOA also provided that notice be
given to all parties of any such offer “in writing by mail or telegram, postage or
charges prepaid, or by telex or telecopier and addressed to the parties to whom the
notice is given at the addresses listed on Exhibit ‘A’.” The notice was deemed given
only when received by the party to whom the notice was directed, and the time for
response ran from the date the originating notice was received. The McCourt Field
JVA similarly provided that “all notices required or permitted to be given hereunder
shall be personally delivered to the party to whom such notice is addressed” or mailed
to the party by certified mail. 
          Although Dernick held title to the Wilsteins’ interest in the field and was the
nominee of the venture for making acquisitions on its behalf under the terms of the
McCourt Field JVA, Dernick did not give the Wilsteins written notice of the
opportunity to purchase Snyder’s interest and of the terms of the offer as required by
the McCourt Field JOA and JVA. Nor is there any evidence that Snyder directly
notified the Wilsteins of the opportunity. However, Harry Dernick testified, and the
trial court found, that he orally informed David Wilstein in October 1996 of the
opportunity to purchase Snyder’s interest and that Wilstein declined.
          Dernick did not have enough funds to buy Snyder’s interest for $3,056,000 in
cash. Therefore, it considered other alternatives to obtain the capital to buy out
Snyder. On or about December 13, 1996, Dernick bought Snyder’s 75% interest in the
McCourt Field by executing a VPP agreement with the Resource Fund, L.P.I.


 Under
the terms of the VPP agreement, Resource Fund advanced $3,200,000 to Dernick in
return for the sale of 90% of the gas production from all of the undivided working
interest in the McCourt Field to ResourceFund for a five-year period running from
February 1, 1997 to January 31, 2002. To secure the obligation to repay the cash
advance, ResourceFund took a mortgage on all the gas in the field and its above-ground facilities. After monthly production quotas were delivered to ResourceFund,
the remaining 10% of the oil and gas in the McCourt Field could be sold for a profit. 
          Dernick used the $3,200,000 advanced by Resource Fund to buy out Snyder. 
To repay ResourceFund, Dernick committed 90% of its own, the Wilsteins’, and
Snyder’s gas production to ResourceFund for five years. In January 1997, following
the acquisition, Pathex Petroleum, Inc. (“Pathex”), a wholly-owned subsidiary and
alter ego of Dernick, became operator of the McCourt Field. Dernick did not inform
the Wilsteins that it had bought Snyder’s 75% interest in the McCourt Field and
financed the transaction by burdening the field with a VPP secured by a lien on all the
gas in the field and the above-ground facilities to purchase Snyder’s interest. It simply
began conveying 90% of the gas in the field to ResourceFund.
C. The Purchase of Burciaga’s Interest in Dernick and the Sale of
Dernick’s and the Wilsteins’ Interest in the Bradshaw Field Joint Venture

          In 1995, Gil Burciaga invested cash in Dernick in exchange for one-third of
Dernick’s shares. Burciaga also served on the Board of Directors for Dernick
beginning in 1996. Burciaga separately owned Lakota Resources, Inc. (“Lakota”).
          After Dernick entered into the VPP with ResourceFund in 1996 to buy Snyder’s
75% interest in the McCourt Field, Burciaga’s relationship with Dernick deteriorated. 
To buy out Burciaga’s interest in Dernick, Dernick attempted to sell some of its assets,
including interest in a field known as the Sydney Field and the entire interest to which
Dernick held title in the Bradshaw Field in Kansas. 
          As in the McCourt Field, Dernick and the Wilsteins were joint venturers in the
Bradshaw Field. That venture was likewise formed to provide for the acquisition of
oil and gas leases and to conduct drilling operations for the venturers’ joint account. 
Dernick owned a 25% undivided working interest in the Bradshaw Field joint venture;
each of the Wilsteins owned a 12½% undivided interest for a total interest of 25%; and
Natural Gas Clearinghouse owned the other 50%. 
          The Bradshaw Field JVA, executed in 1994, was very similar to the McCourt
Field JVA. Its capital was the undivided interest acquired in the leases and the funds
contributed by the venturers in connection with acquiring leasehold interests, drilling
wells, and conducting operations. Each venturer was required to contribute his
proportionate share of all costs in accordance with his percentage interest. The JVA
authorized Dernick to acquire interests in the leases and to make drilling commitments
with respect to them. It also gave Dernick the full right and authority to negotiate for
the acquisition or sale of interests as the nominee of the venture and to execute all
documents, including operating agreements, drilling commitments, purchase and sale
agreements, and other appropriate documents that Dernick, in its discretion, deemed
necessary or appropriate.
          As under the McCourt Field JVA, the venturers had an undivided interest in the
leases and in all production of oil and gas, which they owned as tenants in common. 
Also as under the McCourt Field JVA, Dernick had the option to maintain record title
to the interest of the venturers in the leases as the nominee of the venture, but the JVA
expressly provided that the interest was owned as tenants in common and that the
relationship of the venturers and Dernick was that of co-owners. All encumbrances,
transfers, and other dispositions made by any venturer were expressly made subject
to the JVA, any applicable operating agreement, and any other agreement entered into
pursuant to the JVA. Finally, and again like the McCourt Field JVA, the Bradshaw
Field JVA provided that “all notices required or permitted to be given hereunder shall
be personally delivered to the party to whom such notice is addressed” or mailed to
the party by certified mail.
          On or about June 1, 1998, in order to obtain funds to buy Burciaga’s stock in
Dernick, Dernick sold all of its “right, title, and interest” in the Bradshaw Field under
a Purchase and Sale Agreement between itself and Bradshaw Energy, L.L.C. (the
Bradshaw Field PSA). Because the Bradshaw Field JVA conferred on all venturers
an undivided interest in the leases, and because Dernick was empowered to sell that
interest as the nominee of the Wilsteins and held title to the Wilsteins’ interest as their
nominee, as well as its own, the sale of all of Dernick’s “right, title, and interest” in
the Bradshaw Field necessarily included the sale of the Wilsteins’ interest in the field. 
          Dernick did not disclose to the Wilsteins its sale of their own and its interest in
the Bradshaw Field in writing in accordance with the terms of the Bradshaw Field
JVA. However, it did record the transaction in the Kansas land records on or about
June 28, 1998. 
D. Dernick’s Sale to Lakota of a Working Interest in the McCourt Field 

          Although Dernick sold all of the interests to which it held title in the Bradshaw
Field, including the Wilsteins’ interest, in addition to selling its interest in the Sydney
Field, the funds generated from the sales were still not enough to buy out Burciaga’s
interest in Dernick. To acquire the rest of the capital needed to purchase Burciaga’s
stock in the company, Dernick entered into a Purchase and Sale Agreement (the
“McCourt Field PSA”) with Burciaga’s company, Lakota, on July 1, 1998. The
McCourt Field PSA granted Lakota a 19.360% “undivided interest” in Dernick’s
“rights, title and interest” in the McCourt Field, including its interest in the oil and gas
wells and the production therefrom. Lakota’s interest in the McCourt Field was
expressly made subject to the VPP agreement with which Dernick had burdened the
McCourt Field in order to obtain funds to buy out Snyder, and it was made subject to
Lakota’s proportionate share of balances and amounts of gas owing and due to
ResourceFund under the VPP agreement. There was, however, no joint venture
agreement between Lakota and Dernick.
E. Dernick’s Repurchase of the VPP Burdening the McCourt Field and the
2000 Audit

          On or about April 28, 2000, Dernick repurchased the VPP burdening the
McCourt Field from ResourceFund. It did not inform either the Wilsteins, its
cotenants and venture partners under the McCourt Field JVA and JOA, or Lakota, its
cotenant under the McCourt Field JOA, that it had repurchased the VPP, which had
been due to expire on January 31, 2002. After Dernick repurchased the VPP, paying
off the mortgage it had placed on the McCourt Field, it was able to sell at higher prices
the gas from the field that had formerly been committed to ResourceFund, but, as
operator of the field, it continued to charge the non-operating working interest
owners—Lakota and the Wilsteins—as if the VPP still burdened their interests. It did
not offer Lakota or the Wilsteins the opportunity to pay off their shares of the VPP and
to receive a higher price for their gas as well.
          Between June and September, 2000, AMS Consultants conducted an audit of
the McCourt Field on behalf of Lakota and the Wilsteins. As a result of the audit,
which AMS provided to them on or about January 29, 2001, the Wilsteins discovered
that Dernick had obtained the funds to buy out Snyder’s working interest in the
McCourt Field in December 1996 by burdening the production in the field with the
VPP and that it had subsequently repurchased the VPP and sold the gas at a higher
price without giving them the benefit of the repurchase. Instead, Dernick had
continued to treat their interest as if it were still burdened with the VPP. The trial
court found that the Wilsteins discovered the existence of the VPP on or about January
29, 2001, when AMS provided them the results of the audit. 
          On June 20, 2002, Lakota filed suit against Dernick and Pathex, which had been
the operator of the field since January 1997 as Dernick’s subsidiary and assignee.
F. The Second Audit and the Wilsteins’ Assertion of Claims Against
Dernick 

          In the course of a second audit in 2002, the Wilsteins discovered Dernick’s June
1, 1998 sale of all of the interests in the Bradshaw Field to which Dernick held title,
including their own. 
          In October 2003, the Wilsteins joined the litigation commenced by Lakota


 and
asserted claims against Dernick for breach of fiduciary duty and fraud in connection
with Dernick’s sale of their interest in the Bradshaw Field without notice, Dernick’s
acquisition of Snyder’s interest in the McCourt Field by burdening the field with the
VPP, and Dernick’s repurchase of the VPP and resale of the gas for its own benefit. 
The Wilsteins claimed that they had not had notice of the sale of their working interest
in the Bradshaw Field, that they had not been given the opportunity to participate in
the acquisition of Snyder’s interest in the McCourt Field financed with the VPP, and
that they had not been notified of the repurchase of the VPP and offered the benefit
of the same bargain as Dernick. 
          In addition to denying the Wilsteins’ claims, Dernick filed affirmative defenses
claiming that their claims were barred by the statute of limitations. It claimed that the
Wilsteins had constructive notice of the sale of their interest in the Bradshaw Field on
June 1, 1998 because Dernick had recorded the sale in the Kansas land records on or
about June 28, 1998. Dernick also claimed that it had notified the Wilsteins of the
opportunity to purchase Snyder’s interest in the McCourt Field by Stephen Dernick’s
telephoning David Wilstein and asking whether the brothers were interested in the
acquisition in October 1996 and that the Wilsteins had elected not to participate in the
acquisition. Therefore, according to Dernick, the four-year statute of limitations ran
on both claims well before the Wilsteins filed their suit against Dernick in October,
2003.
G. The Bench Trial and the Court’s Findings of Fact and Conclusions of
Law

          The trial court held a two-week bench trial, after which it filed findings of fact
and conclusions of law on October 13, 2005.
          The court held that the Wilsteins had constructive notice of the sale of their
interest in the Bradshaw Field when Dernick recorded the sale in the Kansas land
records in June 1998, and therefore their claims with respect to the Bradshaw Field
were barred by limitations. The court made the following pertinent findings of fact:
41.     On or about December 1994, Dernick and the Wilstein Brothers
entered into an Agreement to drill certain wells in the Bradshaw
Field (the Bradshaw Leases).
 
. . . .
 
44.     Dernick sold all its interests in the Bradshaw Field and the
Bradshaw Leases on or about June 1, 1998, and recorded the
transaction in the deed records in Kansas on or about June 28,
1998.

The court also made the following pertinent conclusions of law with respect to the
Wilsteins’ Bradshaw Field claims:
7.       The ownership of oil and gas in the ground is a real property
interest.
 
. . . .
 
15.     The doctrine of constructive notice creates an irrebuttable
presumption of actual notice of certain matters. It is applied when
a person knows where to find the relevant information and had a
duty to find that information, but failed to seek it out.
 
16.     Real property records may constitute constructive notice of the
information that one could gain by an examination of the public
records.
 
. . . .
 
18.     The existence of public records may not always constitute
constructive notice, but it is sufficient to void a claim that such an
injury is inherently undiscoverable.
 
19.     The filing of the Bradshaw transaction in the deed records in
Kansas is sufficient to start the running of the statute of limitations
on claims relating to that transaction.
 
. . . .
 
22.     There is insufficient evidence to establish fraudulent concealment
by Dernick.
 
23.     The statute of limitations on the Wilsteins’ claims regarding the
Bradshaw Field began to run on or about June 28, 1998.

          With respect to Dernick’s purchase of Snyder’s interest in the McCourt Field
through the VPP financing transaction and its early repurchase of the VPP, the trial
court made the following pertinent findings of fact:
1.       On or about November 21, 1991, certain parties, including David
Wilstein and Leonard Wilstein (sometimes, collectively, the
“Wilstein Brothers”) and Dernick Resources, Inc. (“Dernick”)
entered into an Agreement (“JVA”), effective as of on or about
August 30, 1991.
 
2.       A signed copy of the JVA was not produced at trial; however, all
parties agree that the draft JVA admitted at trial contains the
operative terms of the JVA, and all parties agree to be bound by
the terms of the draft JVA.
 
3.       The acreage involved in the JVA was the Niobrara Properties in
Nebraska (the Field).
 
4.       The Wilstein Brothers forwarded money to Dernick to acquire
property in the Field (the “Initial Interest in the JVA Field”).
 
5.       On or about November 1, 1991, Snyder Oil Corporation
(“Snyder”) and Dernick entered into an Agreement (“JOA”).
 
. . . .
 
13.     In or around 1995, Gil Burciaga (“Burciaga”), president of Lakota
Resources, Inc. (“Lakota”), purchased a 1/3 interest in Dernick.
 
14.     On or about October 2, 1996, Dernick received notice from Snyder
of an offer to buy Snyder’s Interest in the JOA Field and other
facilities (the 1996 Snyder Acquisition).
 
. . . .
 
17.     On or about December 13, 1996, Snyder assigned the 1996 Snyder
Acquisition to Dernick.
 
18.     On or about December 13, 1996, Dernick entered into a
Volumetric Production Payment (“VPP”) with ResourceFund,
effective February 1, 1997, which burdened up to 90% of the net
gas proceeds from the initial interest in the JVA Field plus the
1996 Snyder Acquisition (the total of these interests sometimes
called “1997 Interests”).
 
19.     Notice was not given by Dernick to the Wilstein Brothers of the
encumbrance of the 1997 Interests by the VPP.
 
20.     The preponderance of credible evidence establishes that the
Wilstein Brothers’ Interest in the initial interest in the [McCourt]
JVA Field (“Wilstein Initial Interest”) was burdened by the VPP.
 
21.     None of the proceeds from the VPP was allocated to the Wilstein
Brothers or the Wilstein Initial Interest.
 
. . . .
 
30.     Between on or about June 2000 and on or about September 4,
2000, AMS Consultants (“AMS”) audited [Dernick] and the 1997
Interests on behalf of David Wilstein and Lakota.
 
31.     On or about April 28, 2000, Dernick repurchased the VPP.
 
32.     Dernick gave no written notice to Lakota or the Wilstein Brothers
of the repurchase of the VPP.
 
33.     Dernick continued to charge Lakota’s Interest with its share of the
VPP burden.
 
34.     On or about January 29, 2001, AMS gave to Lakota and David
Wilstein the audit of the 1997 Interests, which, among other
things, gave them notice of the existence of the VPP.
 
35.     The VPP expired on or about January 31, 2002.

          With respect to the placing of the VPP on the McCourt Field and Dernick’s
repurchase of the VPP, the trial court made the following pertinent conclusions of law:
4.       The terms of the [McCourt Field] JVA required Dernick to acquire
property and execute documents as the nominee of the venture, or
on its behalf, and to maintain record title as the nominee of the
venture.
 
5.       The terms of the [McCourt Field] JVA required property acquired
thereunder, and all production of oil or gas therefrom, to be owned
as tenants in common by the venturers.
 
6.       When title to property is taken in the name of someone other than
the person who advances the purchase price, a resulting trust is
created in favor of the payor. 
 
. . . .
 
14.     Dernick’s burdening the Initial Interest in the [McCourt] JVA
Field, including the Wilstein Initial Interest, was a breach of the
narrow fiduciary duties owed the Wilstein Brothers as the co-owners of the Initial Interest in the [McCourt] JVA Field.
 
. . . .
 
20.     The filing of any records regarding the VPP transactions in
Nebraska and/or Texas is not sufficient to start the running of the
statute of limitations on claims against fiduciaries relating to those
transactions.

. . . .
 
25.     The statute of limitations on Lakota’s and the Wilsteins’ claims
regarding the sale of the VPP to ResourceFund began to run on or
after January 29, 2001.
 
26.     Dernick did not have an obligation to notify either Lakota or the
Wilstein Brothers of its election to repurchase the VPP from
ResourceFund.
          The trial court also held that the Wilsteins’ claims that they were not allowed
to participate in the 1996 acquisition of Snyder’s interest in the McCourt Field were
barred by limitations. The court made the following additional pertinent finding of
fact with respect to the Snyder acquisition:
 
          16.     The preponderance of credible evidence establishes that, sometime
in or around October 1996, Stephen Dernick telephoned David
Wilstein and offered the Wilstein Brothers an opportunity to
participate in the 1996 Snyder Acquisition, which opportunity was
declined.

The court also made the following pertinent conclusion of law:
 
          24.     The statute of limitations on the Wilsteins’ claims regarding the
1996 Snyder Acquisition began to run on or about October 1996.

          The trial court then conducted a month-long jury trial on the remaining issues. 
          H. The Jury Trial and the Trial Court’s Final Judgment
          The jury trial began on May 10, 2006. On March 5, 2007, the trial court signed
a modified final judgment. In accordance with the jury’s findings, the trial court
awarded the Wilsteins $287,400 for losses sustained as a result of the McCourt Field
VPP, $13,226 for the difference between the amount that the Wilsteins received for
their share of gas produced from the McCourt Field and the amount that the Wilsteins
should have received, and $225,000 in attorney’s fees.


 
          The trial court also ordered Dernick to pay David and Leonard Wilstein
$250,000 each in exemplary damages. Although the jury found in favor of the
Wilsteins on their conversion claim, the trial court granted Dernick’s motion to
disregard the jury’s finding. 
II. The Wilsteins’ Appeal
          The Wilsteins raise two issues on appeal. First, they argue that the trial court
erred in holding that a telephone call Stephen Dernick made to David Wilstein in
October 1996 regarding the opportunity to purchase Snyder’s interest in the McCourt
Field for $3,056,000 constituted notice of the opportunity to participate in the Snyder
Acquisition and that, therefore, the statute of limitations bars their claims with respect
to the acquisition. Second, they argue that the trial court erred in holding that
Dernick’s recording of the sale of the interests to which it held title in the Bradshaw
Field in the Kansas land records on June 28, 1998 constituted constructive notice of
the sale of their interest in that field and that, therefore, the statute of limitations bars
their claims with respect to the Bradshaw Field. 
          The Wilsteins contend that, as they were joint venturers with Dernick in both
the McCourt Field and the Bradshaw Field, Dernick owed them a fiduciary duty of
disclosure both with respect to the acquisition of Snyder’s interest in the McCourt
Field and with respect to the sale of their working interest in the Bradshaw Field. 
They contend that because Dernick breached its duty in both cases, the fraudulent
concealment rule applies and tolls the running of the statute of limitations until their
discovery of the breaches, which followed the audits of the McCourt and Bradshaw
Fields that the Wilsteins sought. Therefore, the Wilsteins argue, their claims with
respect to the denial of the opportunity to participate in the acquisition of Snyder’s
interest in the McCourt Field and with respect to Dernick’s sale of their interest in the
Bradshaw Field are not barred by limitations.
          A. Fiduciary Duty of Joint Venturer
          The Wilsteins argue that the fraudulent concealment doctrine applies because
the McCourt Field and Bradshaw Field JVA’s imposed a fiduciary duty of disclosure
on Dernick, which Dernick breached in both cases. Therefore, limitations was tolled
until they discovered facts that put them on notice of Dernick’s breach of its duty.
           Whether there is a fiduciary duty is a question of law for the court, not a fact
question for the jury. Taylor v. GWR Operating Co., 820 S.W.2d 908, 911 (Tex.
App.—Houston [1st Dist.] 1991, writ denied). The facts that give rise to a fiduciary
duty are, however, questions for the fact finder. Id. Thus, when, as here, the
underlying facts are undisputed, the determination of the existence of a fiduciary duty
is a question of law. Meyer v. Cathey, 167 S.W.3d 327, 330 (Tex. 2005). Likewise,
when the facts are undisputed, the question of whether a fiduciary duty has been
breached is a question of law for the court. Fuqua v. Taylor, 683 S.W.2d 735, 738
(Tex. App.—Dallas 1984, writ ref’d n.r.e.).
          The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship
between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty
to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result
of the defendant’s breach. Jones v. Blume, 196 S.W.3d 440, 447 (Tex. App.—Dallas
2006, pet. denied) (citing Punts v. Wilson, 137 S.W.3d 889, 891 (Tex.
App.—Texarkana 2004, no pet.)). A fiduciary relationship imposes a duty on the
fiduciary to render full and fair disclosure of facts material to the relationship giving
rise to the duty. Willis v. Maverick, 760 S.W.2d 642, 645 & n.2 (Tex. 1988).
          Joint venturers for the development of a particular oil and gas lease have
fiduciary duties to each other arising from the relationship of joint ownership of the
mineral rights of the lease. Rankin v. Naftalis, 557 S.W.2d 940, 944 (Tex. 1977);
Fuqua, 683 S.W.2d at 738. Likewise, if there is a joint venture between the operating
owner of an interest in oil and gas well drilling operations and the non-operating
interest owners, the operating owner owes a fiduciary duty to the non-operating
interest owners . Taylor, 820 S.W.2d at 909, 911–12. In addition, “[a]n appointment
of an attorney-in-fact creates an agency relationship,” and an agency creates a
fiduciary relationship as a matter of law. Tyler v. State, 137 S.W.3d 261, 266 (Tex.
App.—Houston [1st Dist.] 2004, no pet.) (citing Matthews v. Sun Oil Co., 425 S.W.2d
330, 337 (Tex. 1968), and Smith v. Lanier, 998 S.W.2d 324, 334 (Tex. App.—Austin
1999, pet. denied)). The scope of the fiduciary duties raised by a joint venture
relationship, however, does not extend beyond the development of the particular lease
and activities related to that development. Rankin, 557 S.W.2d at 944–45.
          Here, Dernick and the Wilsteins were joint venture partners in both the McCourt
Field and the Bradshaw Field. In addition, Dernick was the operating owner of both
fields, and the Wilsteins were non-operating interest owners. And, Dernick was
appointed attorney-in-fact for the venturers in both JVAs. Therefore, we hold that
Dernick owed a fiduciary duty of full and fair disclosure to the Wilsteins with respect
to both joint ventures.
          B. Limitations and Fraudulent Concealment
          The Wilsteins brought claims of fraud and breach of fiduciary duty against
Dernick. Texas law prescribes a four-year statute of limitations for both. Tex. Civ.
Prac. & Rem. Code Ann. § 16.004(a) (Vernon 2002). 
          “As a general rule, a cause of action accrues and the statute of limitations begins
to run when facts come into existence that authorize a party to seek a judicial remedy.” 
Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 221 (Tex. 2003). Thus,
“[a] defendant who seeks summary judgment on the basis of limitations must
conclusively prove when the plaintiff’s cause of action accrued.” Seureau v.
ExxonMobil Corp., 274 S.W.3d 206, 226 (Tex. App.—Houston [14th Dist.] 2008, no
pet.). The date the cause of action accrues for purposes of limitations is a question of
law. Id. In most circumstances, “a cause of action accrues when a wrongful act causes
a legal injury, regardless of when the plaintiff learns of that injury or if all resulting
damages have yet to occur.” Id.; Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351
(Tex. 1990).
          The fraudulent concealment doctrine, however, is an affirmative defense to
limitations that resembles equitable estoppel. Seureau, 274 S.W.3d at 228. This
doctrine estops a defendant from relying on limitations if he was under a duty to make
a disclosure but fraudulently concealed the existence of a cause of action from the
party to whom it belonged. Id. The accrual of a cause of action is deferred in a
fraudulent concealment case until the plaintiff discovers or should have discovered the
deceitful conduct or facts giving rise to the cause of action. Earle v. Ratliff, 998
S.W.2d 882, 888 (Tex. 1999). The fraudulent concealment doctrine defers accrual
because “a person cannot be permitted to avoid liability for his actions by deceitfully
concealing wrongdoing until limitations has run.” S.V. v. R.V., 933 S.W.2d 1, 6 (Tex.
1996). For the doctrine to apply, however, the plaintiff must prove the defendant:
(1) had actual knowledge of the wrong; (2) had a fixed purpose to conceal the wrong;
and (3) did conceal the wrong from the plaintiff. See Shah v. Moss, 67 S.W.3d 836,
841 (Tex. 2001). The fraudulent concealment doctrine does not bar limitations when
the plaintiff discovers the wrong or could have discovered it through the exercise of
reasonable diligence. Kerlin v. Sauceda, 263 S.W.3d 920, 925 (Tex. 2008).
          A breach of a fiduciary duty of disclosure is tantamount to concealment for
limitations purposes. Id. at 645; see Seureau, 274 S.W.3d at 228 (including as
additional element of fraudulent concealment doctrine “a duty to disclose the wrong”). 
Thus, the statute of limitations for a breach of fiduciary duty claim does not begin to
run until the claimant “knew or should have known of facts that in the exercise of
reasonable diligence would have led to the discovery of the wrongful act.” Little v.
Smith, 943 S.W.2d 414, 420 (Tex. 1997); see also Willis, 760 S.W.2d at 645 (accrual
of cause of action of person to whom duty is owed is postponed until he discovers, or
should discover, material facts in issue); Seureau, 274 S.W.3d at 228 (“The estoppel
effect of fraudulent concealment ends when a party learns of facts, conditions, or
circumstances that would cause a reasonably prudent person to make inquiry which,
if pursued, would lead to the discovery of the concealed cause of action.”). “When a
failure to notify is the basis for a cause of action, a plaintiff knows or should have
known of the failure to notify when it knows or should have known the facts about
which it was to be notified,” and the statute of limitations begins to run at that time. 
HECI Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998).
          Because the Wilsteins and Dernick were joint venturers in both the McCourt
Field and the Bradshaw Field, the fraudulent concealment doctrine applies in both
cases. See Willis, 760 S.W.2d at 645 & n.2; Seureau, 274 S.W.3d at 228. The
questions, therefore, for limitations purposes are whether Dernick breached its duty
of disclosure to the Wilsteins in both cases and, if so, when the Wilsteins learned of
facts, conditions, or circumstances that would cause a reasonably prudent person to
make inquiry that, if pursued, would lead to the discovery of the concealed cause of
action for the breach. See Seureau, 274 S.W.3d at 228.



C. First Issue: The Wilsteins’ Claims with Respect to the Snyder
Acquisition

          In their first issue, the Wilsteins state that they had a contractual right under the
McCourt Field JVA to be notified in writing of the opportunity to participate in
acquiring Snyder’s interest in the McCourt Field. They contend that the trial court
erred in starting the running of the statute of limitations when Stephen Dernick
telephoned David Wilstein in October 1996 and offered the Wilsteins the opportunity
to participate in the purchase of Snyder’s 75% interest in the McCourt Field for
$3,056,000 in cash, of which the Wilsteins would owe $1.6 to $1.7 million. The
Wilsteins contend that the deal changed to require no up-front outlay of cash, that the
“change in material terms triggered a new obligation to notify the Wilsteins,” and that
this second notice did not occur. The Wilsteins argue that “it was not until 2003 that
the Wilsteins learned of Dernick’s clandestine purchase” of Snyder’s interest in the
McCourt Field. Their counterclaim also asserted that they “were never made aware
of the need to make an inquiry as to whether Dernick had acquired additional interests
in the McCourt Field, and were never put on notice that these interests were acquired
by Dernick.” The Wilsteins contended they “did not know of and could not have
discovered Dernick’s non-compliance with the Joint Venture Agreement in the
exercise of ordinary diligence.” They contended that “Dernick acquired the Snyder
interest without offering the Wilsteins the opportunity to participate in this acquisition
as contractually required. Dernick breached its fiduciary and contractual duties to the
Wilsteins by unilaterally acquiring this interest without offering same to the
Wilsteins.” We agree with the Wilsteins.
          We have held that Dernick owed the Wilsteins the fiduciary duties of a joint
venturer. See Rankin, 557 S.W.2d at 944; Fuqua, 683 S.W.2d at 738. Thus, it owed
them a duty of full and fair disclosure of facts that, if known, would reveal the
existence of a cause of action. See Willis, 760 S.W.2d at 645 & n.2 (holding that
breach of duty of attorney to disclose facts material to representation is tantamount to
fraudulent concealment); Seureau, 274 S.W.3d at 228 (holding that fraudulent
concealment doctrine “estops a defendant from relying on the defense of limitations
if the defendant was under a duty to make a disclosure but fraudulently concealed the
existence of a cause of action from the party to whom it belongs”); see also
Courseview, Inc. v. Phillips Petroleum Co., 312 S.W.2d 197, 206 (Tex. 1958)
(holding that grantor’s failure to discover fraud on part of oil company in obtaining
conveyance of purchase rights or fact that it had acquired mineral property in which
grantor had right of purchase was not due to want of diligence on part of grantor and
was not barred by limitations where oil company had contractual obligation to give
notice of purchases in designated area and grantor lacked knowledge of facts that
would have aroused suspicions).
          The 1991 McCourt Field JOA provided:
Should any party desire to sell all or any part of its interests in the
Contract Area, it shall promptly give written notice to the other parties, with full
information concerning its proposed sale, which shall include the name and
address of the prospective purchaser (who must be ready, willing and able to
purchase) the purchase price, and all other terms of the offer. The other parties
shall then have an optional prior right, for a period of fifteen (15) business days
after receipt of the notice, to purchase on the same terms and conditions the
interest which the other party proposes to sell; and, if this optional right is
exercised, the purchasing parties shall share the purchased interests in the
proportions that the interest of each bears to the total interest of all purchasing
parties. . . .

Likewise, the McCourt Field JVA provided that “all notices required or permitted to
be given hereunder shall be personally delivered to the party to whom such notice is
addressed” or mailed to the party by certified mail. Both the JOA and the JVA thus
expressly required written notice of a party’s “desire to sell all or any part of its
interests in the Contract Area,” with “full information concerning its proposed sale”
so that they might exercise their right “to purchase on the same terms and conditions
the interest which the other party proposes to sell” in proportion to their interest in the
field. 
          Snyder notified Dernick of the proposed sale, and Dernick orally informed the
Wilsteins of Snyder’s desire to sell, but Dernick did not disclose, orally or in writing,
the opportunity to purchase Snyder’s interest by entering a VPP agreement with
Resource Fund. Dernick simply committed their gas, along with its own, to Resource
Fund in order to obtain cash to buy out Snyder. We hold, therefore, that Dernick
breached the notice requirements of the JOA and JVA and, in doing so, breached its
duty of full and fair disclosure to the Wilsteins. These actions gave rise to a concealed
cause of action against Dernick for breach of fiduciary duty. See Willis, 760 S.W.2d
at 645 & n.2; Seureau, 274 S.W.3d at 228.
          Our conclusion that Dernick’s actions gave rise to a concealed cause of action
for breach of its fiduciary duty of disclosure is not changed by Dernick’s argument in
its cross-appeal. Specifically, Dernick argues that “the evidence conclusively
established that no portion of the McCourt Field production applicable to the Wilsteins
was taken to satisfy the VPP” and that because only 90% of the gas production from
the McCourt Field was committed to the VPP and only 76% of the net production was
actually taken by ResourceFund, while the Wilsteins owned only 10% of the working
interest in the McCourt Field and 8.35% of the net production of the field, “the
Wilsteins cannot demonstrate that any gas production to which they were entitled was
diverted by the VPP.” 
          It is undisputed that Dernick financed the purchase of Snyder’s interest in the
McCourt Field by encumbering the field with a VPP that obligated Dernick to commit
90% of the gas produced from the field for five years to ResourceFund, beginning
February 1, 1997 and ending January 31, 2002, in exchange for $3,200,000 cash up
front to pay Snyder. The trial court found that the VPP burdened “up to 90% of the
net gas proceeds from the initial interest in the JVA Field plus the Snyder
Acquisition,” where the “initial interest” was the initial 25% undivided working
interest in the McCourt Field acquired by the joint venture in 1991 from Snyder, and
the total initial interests were those of Dernick, the Wilsteins, and Snyder, “sometimes
called the ‘1997 Interests.’” The court also found that “the preponderance of the
evidence established that “the Wilstein Brothers’ Interest in the initial interest in the
JVA Field (“Wilstein Initial Interest”) was burdened by the VPP.” Likewise, the court
found that “[n]one of the proceeds from the VPP was allocated to the Wilstein
Brothers or the Wilstein Initial Interests.” The trial court’s findings are supported by
the record.
          The McCourt Field JVA provided that if the interest of any venturer became
“subject to any . . . production payment or other charge over and above the Initial
Lease Burdens,” such lease burden “shall be subordinate to this Agreement and to any
applicable Operating Agreement.” Thus, the VPP agreement was subject to the
provisions in the McCourt Field JVA and JOA.
          The McCourt Field JVA provided that Dernick and the Wilsteins had a
proportionate undivided interest in the leases acquired, that the interest was owned as
tenants in common, and that the relationship of the venturers and Dernick was that of
co-owners, although title to the interest of the venturers was maintained in the name
of Dernick as nominee of the venture. The JVA gave Dernick the right and authority
to negotiate for the acquisition of additional interests, such as Snyder’s 75% interest
in the McCourt Field, as the nominee of the venture and to execute all documents,
including operating agreements, purchase and sale agreements, and other appropriate
documents that it, in its discretion, deemed necessary or appropriate. The JVA made
Dernick the agent and attorney in fact for the venturers, including the Wilsteins. Thus
Dernick had the right to make acquisitions on behalf of the venture as its nominee and
to hold title to the properties acquired in its own name. But the VPP did not thereby
transfer ownership of the interests on whose behalf Dernick made acquisitions or
entered other agreements. Rather, the JVA imposed on Dernick a fiduciary duty to
disclose to his non-operating co-owners in the McCourt Field any and all negotiations
and acquisitions, which we have held it breached.
          The JVA gave Dernick the right to burden the McCourt Field with a VPP
provided the VPP covered the “entire interest of the venturer” in the field, which the
ResourceFund VPP did not, or “an equal undivided interest” in the field, i.e., an equal
undivided interest of all the venturers—here, an equal undivided 90% interest. The
JVA further provided that if the interest of any venturer became “subject to any . . .
production payment or other charge over and above the Initial Lease Burdens . . . such
Venturer shall assume and alone bear all obligations with respect thereto and shall
account for them to the owners thereof out of his share of the working-interest
production from the [McCourt Field] properties.” Here, Dernick burdened the entire
undivided interest in the field with the VPP, and it did not bear the costs of the VPP
itself; it charged their proportionate costs to the Wilsteins. 
          Despite the foregoing provisions in the JVA, Dernick, in its capacity as nominee
of the undivided working interest in the McCourt Field that it represented and on
whose behalf it acted, and as holder of title for the entire working interest under the
terms of the JVA, represented in the VPP financing transaction documents that it was
the sole “owner of the undivided interests” in the McCourt Field. It then exercised the
powers given it by the JVA to be exercised on behalf of the undivided joint venture
interests to sell “a mineral right and interest in real property,” comprising 90% of the
gas production of the McCourt Field, to ResourceFund for a term of five years in
exchange for cash to buy out Snyder, and it granted ResourceFund a lien on 90% of
the production from the field to ensure payment. 
          The VPP financing transaction consisted of three documents, as is typical of
such a financing arrangement. See EOG Res., Inc. v. Dep’t of Revenue, 86 P.3d 1280,
1282–83 (Wyo. 2004). These were a purchase and sale agreement between Dernick
and ResourceFund dated December 13, 1996, in which Dernick represented that it was
“the owner of certain oil and gas leasehold interests in Cheyenne County, Nebraska”
(Closing Agreement), that it had sold a production payment interest in the leasehold
interests to ResourceFund, and that, “as full payment for the production payment,”
ResourceFund had paid Dernick $3,200,000. The statement that Dernick was the
owner of all of the leasehold interests conveyed was false. It held title to the
undivided leasehold interests of itself and the Wilsteins, as provided by the McCourt
Field JVA, but it was a co-owner of the undivided working interest as a tenant in
common with the Wilsteins.
          Dernick, as “Seller,” also executed a “Conveyance of Production Payment,”
which conveyed to ResourceFund, as “Buyer,” “a mineral right and interest in real
property consisting of a production payment (the “Production Payment”) comprised
of and representing 90% of the natural gas and other hydrocarbons . . . in, under and
which may be produced, saved and sold from, or which accrue or are attributable to,
the Subject Interests” in the McCourt Field, effective February 1, 1997 and
terminating January 31, 2002. In making this conveyance, Dernick represented that
it was “the owner of undivided interests in certain oil and gas leases . . . covering
certain lands located in Cheyenne County, Nebraska (such undivided interests. . .
being herein referred to as the “Subject Interests.)” (emphasis added). The undivided
interests, styled the “Subject Interests” in the Conveyance of Production Payment,
90% of whose production was sold to ResourceFund, were the same interests
referenced by the trial court in its finding of fact number 18 as “the 1997 interests,”
namely, the total undivided working interest in the McCourt Field covered by the
McCourt Field JVA, consisting of the interests of Dernick, the Wilsteins, and Snyder.


 
Dernick’s representation in the “Conveyance of Production Payment” that it was the
owner of the undivided working interest in the leasehold interests in the McCourt
Filed, like its representation of its ownership of the interests conveyed in the Closing
Agreement, was false.
          Finally, Dernick executed a Production and Delivery Agreement between itself
and ResourceFund that governed the delivery of production payment gas to
ResourceFund, granted ResourceFund a lien and security interest in “all of Seller’s
interest in the Subject Interests,” and provided for the repurchase of the production
payment from ResourceFund at “[a]ny time after July 31, 1998” on terms set out in
paragraph 15 of the agreement. In other words, it granted ResourceFund a lien on
100% of the undivided interest in the McCourt Field.
          Because the undivided working interest in the McCourt Field for which Dernick
held title and acted as nominee included not only its own undivided interest but the
undivided interest of its co-tenants—the Wilsteins—Dernick’s claim that it did not
include the Wilsteins’ “mineral right and interest in real property” in its conveyance
of 90% of the gas in the McCourt Field to ResourceFund in exchange for $3, 200,000
cash to buy Snyder’s interest in the field is contradicted by the conclusive evidence
of the VPP transaction. Therefore, Dernick’s argument that it did not commit the
Wilsteins’ gas to the VPP is without merit.
          The trial court found that the Wilsteins did not have notice of the existence of
the VPP transaction until January 29, 2001, when AMS gave them the audit of their
interest in the McCourt Field. This finding is supported by the evidence. We
conclude that the Wilsteins exercised reasonable diligence to discover their cause of
action arising from the Snyder Acquisition by requesting the audit. See HECI, 982
S.W.2d at 886 (holding that when failure to notify forms basis of cause of action,
plaintiff knows or should have known of failure to notify when it knows or should
have known facts about which it was to be notified); Seureau, 274 S.W.3d at 228
(“The estoppel effect of fraudulent concealment ends when a party learns of facts,
conditions, or circumstances that would cause a reasonably prudent person to make
inquiry which, if pursued, would lead to the discovery of the concealed cause of
action.”). The Wilsteins filed their breach of fiduciary duty claims in 2003, well
within the four year statute of limitations for fraud and breach of fiduciary duty. 
          We hold that the Wilsteins’ claims with respect to the Snyder Acquisition were
not barred by the four-year statute of limitations.
          We sustain the Wilsteins’ first issue on appeal. 
D. Second Issue: The Wilsteins’ Claims with Respect to the Bradshaw
Field 

          In their second issue, the Wilsteins argue that the trial court erred in holding that
their claims against Dernick with respect to the Bradshaw Field were barred by
limitations. The Wilsteins argue that Dernick, their joint venturer under the Bradshaw
Field JVA, breached its fiduciary duty to them by selling their portion of the working
interest in the Bradshaw Field without disclosing the sale to them. 
          Dernick argues that the trial court correctly held that the Wilsteins’ claims with
respect to the Bradshaw Field were barred by limitations. Dernick contends, and the
trial court found, that the sale, which occurred on June 1, 1998, was recorded in the
Greeley County, Kansas land records on or about June 28, 1998. Therefore the
Wilsteins were on constructive notice of the sale of their interest in the Bradshaw
Field at that time, and the four-year statute of limitations ran before they filed their
claims in October, 2003. 
          The Wilsteins respond that they did not have actual notice of the Bradshaw sale
and that the recording statutes cannot impose constructive notice upon them. They
claim that after they purchased their interest in the Bradshaw Field in 1994 they were
not required to search for other conveyances of the property. They contend that they
are entitled to “their percentage of the sales price attributable to any properties
Dernick acquired subsequent to the creation of the Joint Venture, which the Wilsteins
should have been offered and allowed to participate in.” The Wilsteins contend that
“Dernick’s failure to properly account for the assets of the Joint Venture . . . and its
failure to disclose the sale of the properties, both constitute a breach of its fiduciary
duties, and a breach of the terms of the [Bradshaw Field JVA]. . . .” Again, we agree
with the Wilsteins.
          Like the McCourt Field joint venture, the Bradshaw Field joint venture was
formed to provide for the acquisition of oil and gas leases, this time in Kansas, and the
conduct of drilling operations for the venturers’ joint account. Dernick owned a 25%
working interest in the Bradshaw Field joint venture, each of the Wilsteins owned a
12½% interest, for a total interest of 25%, and Natural Gas Clearinghouse owned the
other 50%. As in the McCourt Field joint venture, the Bradshaw Field venturers all
had an undivided interest in the leases and in all production of oil and gas, which they
owned as tenants in common, and the Bradshaw Field JVA gave Dernick the full right
and authority to negotiate for the acquisition or sale of interests as the nominee of the
venture and to execute all documents, including purchase and sale agreements, that
Dernick, in its discretion, deemed necessary or appropriate. Dernick also had the
option to maintain record title to the interest of the venturers in the leases as the
nominee of the venture, but the JVA expressly stated that the interest was owned as
tenants in common and that the relationship of the venturers and Dernick was that of
co-owners. Finally, the JVA provided that “all notices required or permitted to be
given hereunder shall be personally delivered to the party to whom such notice is
addressed” or mailed to the party by certified mail.
          We hold that, just as with respect to the McCourt Field joint venture, Dernick
had a fiduciary duty as joint venturer and operator of the Bradshaw Field to notify the
Wilsteins of the sale of their interest in the Bradshaw Field, which it undertook as their
nominee, and to account to them for that interest. It is undisputed that it did neither. 
Therefore, it breached its fiduciary duty. Its breach of its fiduciary duty of disclosure
was tantamount to fraudulent concealment for limitations purposes. See Willis, 760
S.W.2d at 645 (holding that breach of fiduciary duty of disclosure is tantamount to
concealment for limitations purposes).
          Contrary to the trial court’s finding, the Wilsteins were not under any legal duty
to examine the deed records of Greely County, Kansas to ascertain whether Dernick
had breached its fiduciary duties or had breached the JVA agreement. In HECI, the
Texas Supreme Court discussed the relationship between the doctrine of constructive
notice, the discovery rule, and, tangentially, the fraudulent concealment rule. The
court rejected the defendant’s argument that the plaintiff had constructive notice of
public records kept by the Railroad Commission. See HECI, 982 S.W.2d at 886–87. 
The court observed that the constructive notice doctrine applies only in limited
circumstances, including suits to try title and probate proceedings. See id. Thus,
while it recognized that certain public records kept by the Railroad Commission were
“a ready source of information, and a cause of action for failure to provide that same
information [was] not inherently undiscoverable,” it held that those records did not
provide constructive notice to the plaintiff as a matter of law. See id. at 887. 
Moreover, the court stated that “if an operator fraudulently concealed information
from a lessee, decisions of this and other courts indicate that limitations may be
tolled.” Id. at 886 (citing S.V., 933 S.W.2d at 6, for decisions regarding fraudulent
concealment).
          Similarly, in Ojeda de Toca v. Wise, the Texas Supreme Court addressed the
question of whether fraud and DTPA claims were barred as a matter of law because
the defendants’ alleged deception would have been discovered from an examination
of the county records. 748 S.W.2d 449, 450 (Tex. 1988). The court concluded that
recording statutes such as Texas Property Code section 13.002 serve a distinct
purpose: to protect a good faith purchaser “against the evils of secret grants and secret
liens.” Id. at 450–51 (quoting 66 Am. Jur. 2d Records and Recording Laws § 48
(1973)); see also Boucher v. Wallis, 236 S.W.2d 519, 526 (Tex. Civ. App.—Eastland
1951, writ ref’d n.r.e.) (“The purpose of recording laws is to notify subsequent
purchasers of the rights such instruments intended to convey and not to give
protection to perpetrators of fraud.”) (emphasis added). As Ojeda de Toca notes, deed
records by statute afford notice of interests conveyed in real property to protect those
interests and subsequent grantees, not to protect perpetrators of fraud. 748 S.W.2d at
450–51. Here, the Wilsteins were not subsequent grantees or subsequent purchasers
but joint venturers with Dernick and co-owners of the property Dernick secretly sold
in breach of its fiduciary duties under the Bradshaw Field JVA. Therefore the filing
of the sale in the deed records did not constitute constructive notice to the Wilsteins. 
See HECI, 982 S.W.2d at 887.
          We conclude that Dernick breached its fiduciary duty to the Wilsteins by failing
to disclose its sale of their interest in the Bradshaw Field and that the Wilsteins were
not put on constructive notice of the sale by the filing of the sale in the Kansas public
records. The trial court found that the Wilsteins discovered the sale of their interest
in the Bradshaw Field following the 2002 audit of that field. This finding is supported
by the evidence. Because the Wilsteins filed their Bradshaw Field claims in 2003,
their claims were not barred by the four-year statute of limitations for breach of
fiduciary duty and fraud.
          We sustain the Wilsteins’ second issue on appeal. 
III. Dernick’s Cross-Appeal Against the Wilsteins
          In its first issue on cross-appeal, Dernick argues that legally insufficient
evidence supports the jury’s award of damages in favor of the Wilsteins for losses due
to the VPP. In its second and third issues, Dernick argues that the trial court erred in
holding that Dernick owed a fiduciary duty to the Wilsteins and in awarding them a
“fraud non-disclosure recovery.” In its fourth issue, Dernick argues that the trial court
erred in refusing to find the Wilsteins’ claims for losses attributable to the VPP barred
by limitations. Because our disposition of the Wilsteins’ appeal is dispositive of
Dernick’s issues, we do not address Dernick’s cross-appeal separately.
 
 
 
 
 
Conclusion
          We reverse the judgment of the trial court on the Wilsteins’ claims and remand
the case for further proceedings consistent with this opinion.





                                                             Evelyn V. Keyes
                                                             Justice
 
Panel consists of Justices Keyes, Alcala, and Hanks.